CALIFORNIA ET AL. *v.* UNITED STATES

No. 77–285.  Argued March 28, 1978—Decided July 3, 1978

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, POWELL, and STEVENS, JJ., joined. WHITE, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post,* p. 679.

*Roderick Walston,* Deputy Attorney General of California, argued the cause for petitioners. With him on the briefs were *Evelle J. Younger,* Attorney General, *R. H. Connett,* Assistant Attorney General, and *Richard C. Jacobs,* Deputy Attorney General.

*Deputy Solicitor General Barnett* argued the cause for the United States. With him on the brief were *Solicitor General McCree, Acting Assistant Attorney General Sagalkin, Sara Sun Beale, Peter R. Steenland,* and *Carl Strass.**

---

*A brief of *amici curiae* urging reversal was filed by officials for their respective States as follows: *Bruce E. Babbitt,* Attorney General of Arizona, and *Ralph E. Hunsaker; J. D. MacFarlane,* Attorney General of Colorado, and *David W. Robbins,* Deputy Attorney General; *Wayne L. Kidwell,* Attorney General of Idaho; *Curt T. Schneider,* Attorney General of Kansas; *Mike Greely,* Attorney General of Montana; *Paul L. Douglas,* Attorney General of Nebraska, and *Steven C. Smith,* Assistant Attorney General; *Robert List,* Attorney General of Nevada, and *Harry W. Swainston,* Deputy Attorney General; *Toney Anaya,* Attorney General of New Mexico, and *Richard A. Simms,* Special Assistant Attorney General; *Allen I. Olson,* Attorney General of North Dakota; *Larry D. Derryberry,* Attorney General of Oklahoma, and *Larry D. Barnett,* Assistant Attorney General; *James A. Redden,* Attorney General of Oregon, and *Al J. Laue,* Solicitor General; *William J. Janklow,* Attorney General of South Dakota,

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

The United States seeks to impound 2.4 million acre-feet of water from California's Stanislaus River as part of its Central Valley Project. The California State Water Resources Control Board ruled that the water could not be allocated to the Government under state law unless it agreed to and complied with various conditions dealing with the water's use. The Government then sought a declaratory judgment in the District Court for the Eastern District of California to the effect that the United States can impound whatever unappropriated water is necessary for a federal reclamation project without complying with state law. The District Court held that, as a matter of comity, the United States must apply to the State for an appropriation permit, but that the State must issue the permit without condition if there is sufficient unappropriated water. 403 F. Supp. 874 (1975). The Court of Appeals for the Ninth Circuit affirmed, but held that § 8 of the Reclamation Act of 1902, 32 Stat. 390, as codified, 43 U. S. C. §§ 372, 383, rather than comity, requires the United States to apply for the permit. 558 F. 2d 1347 (1977). We granted certiorari to review the decision of the Court of Appeals insofar as it holds that California cannot condition its allocation of water to a federal reclamation project. 434 U. S. 984 (1977). We now reverse.

and *Warren R. Neufeld,* Assistant Attorney General; *John L. Hill,* Attorney General of Texas; *Slade Gorton,* Attorney General of Washington, and *Charles B. Roe, Jr.,* Senior Assistant Attorney General; and *V. Frank Mendicino,* Attorney General of Wyoming, and *Jack D. Palma II,* Special Assistant Attorney General. *Thomas Graff* and *Frederic P. Sutherland* filed a brief for the Environmental Defense Fund et al. as *amici curiae* urging reversal.

*Kenneth A. Kuney, John P. Fraser,* and *T. V. A. Dillon* filed a brief for the Friant Water Users Assn. et al. as *amici curiae* urging affirmance.

Briefs of *amici curiae* were filed by *Robert S. Pelcyger* and *Robert D. Stitser* for the Pyramid Lake Paiute Tribe of Indians; and by *Charles J. Meyers pro se.*

## I

Principles of comity and federalism, which the District Court and the Court of Appeals referred to and which have received considerable attention in our decisions, are as a legal matter based on the Constitution of the United States, statutes enacted by Congress, and judge-made law. But the situations invoking the application of these principles have contributed importantly to their formation. Just as it has been truly said that the life of the law is not logic but experience, see O. Holmes, The Common Law 1 (1881), so may it be said that the life of the law is not political philosophy but experience.

The very vastness of our territory as a Nation, the different times at which it was acquired and settled, and the varying physiographic and climatic regimes which obtain in its different parts have all but necessitated the recognition of legal distinctions corresponding to these differences. Those who first set foot in North America from ships sailing the tidal estuaries of Virginia did not confront the same problems as those who sailed flat boats down the Ohio River in search of new sites to farm. Those who cleared the forests in the old Northwest Territory faced totally different physiographic problems from those who built sod huts on the Great Plains. The final expansion of our Nation in the 19th century into the arid lands beyond the hundredth meridian of longitude, which had been shown on early maps as the "Great American Desert," brought the participants in that expansion face to face with the necessity for irrigation in a way that no previous territorial expansion had.

In order to correctly ascertain the meaning of the Reclamation Act of 1902, we must recognize the obvious truth that the history of irrigation and reclamation before that date was much fresher in the minds of those then in Congress than it is to us today. "[T]he afternoon of July 23, 1847, was the true date of the beginning of modern irrigation. It was on that afternoon that the first band of Mormon pioneers built a small

dam across City Creek near the present site of the Mormon Temple and diverted sufficient water to saturate some 5 acres of exceedingly dry land. Before the day was over they had planted potatoes to preserve the seed." [1] During the subsequent half century, irrigation expanded throughout the arid States of the West, supported usually by private enterprise or the local community.[2] By the turn of the century, however, most of the land which could be profitably irrigated by such small-scale projects had been put to use. Pressure mounted on the Federal Government to provide the funding for the massive projects that would be needed to complete the reclamation, culminating in the Reclamation Act of 1902.[3]

The arid lands were not all susceptible of the same sort of reclamation. The climate and topography of the lands that constituted the "Great American Desert" were quite different from the climate and topography of the Pacific Coast States. As noted in both *United States* v. *Gerlach Live Stock Co.,* 339 U. S. 725 (1950), and *Ivanhoe Irrigation District* v. *McCracken,* 357 U. S. 275 (1958), the latter States not only had a more pronounced seasonal variation and precipitation than the intermountain States, but the interior portions of California had climatic advantages which many of the intermountain States did not.

"The prime value in our national economy of the lands of summer drought on the Pacific coast is as a source of

---

[1] A. Golzé, Reclamation in the United States 6 (2d ed. 1961). The author was at the time of publication the Chief Engineer of the California Department of Water Resources and had been formerly Assistant Commissioner of the United States Bureau of Reclamation.

[2] *Id.,* at 6–12.

[3] *Id.,* at 12–13. Private development has continued to be a major contributor to the reclamation of the West. From 1902 to 1950, federal reclamation projects increased the amount of irrigated land by 5,700,000 acres. This still only accounted, however, for approximately one-fifth of the irrigated acreage in the 17 Western States covered by the Reclamation Act of 1902. During the same period from 1902 to 1950, private reclamation opened up over 10,000,000 acres for irrigation. *Id.,* at 14, Table 1–1.

plant products that require mild winters and long growing seasons. Citrus fruits, the less hardy deciduous fruits, fresh vegetables in winter—these are their most important contributions at present. Rainless summers make possible the inexpensive drying of fruits, which puts into the market prunes, raisins, dried peaches, and apricots. In its present relation to American economy in general, the primary technical problem of agriculture in the Pacific Coast States is to make increasingly more effective use of the mild winters and the long growing season in the face of the great obstacle presented by the rainless summers. To overcome that obstacle supplementary irrigation is necessary. Hence the key position of water in Pacific Coast agriculture." [4]

If the term "cooperative federalism" had been in vogue in 1902, the Reclamation Act of that year would surely have qualified as a leading example of it. In that Act, Congress set forth on a massive program to construct and operate dams, reservoirs, and canals for the reclamation of the arid lands in 17 Western States. Reflective of the "cooperative federalism" which the Act embodied is § 8, whose exact meaning and scope are the critical inquiries in this case:

> "[N]othing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof: Provided, that the

---

[4] U. S. Department of Agriculture, Climate and Man 204 (1941). For a general description of water conditions in California and the Californians' answer to them, see E. Cooper, Aqueduct Empire (1968).

right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right." 32 Stat. 390 (emphasis added).

Perhaps because of the cooperative nature of the legislation, and the fact that Congress in the Act merely authorized the expenditure of funds in States whose citizens were generally anxious to have them expended, there has not been a great deal of litigation involving the meaning of its language. Indeed, so far as we can tell, the first case to come to this Court involving the Act at all was *Ickes* v. *Fox,* 300 U. S. 82 (1937), and the first case to require construction of § 8 of the Act was *United States* v. *Gerlach Live Stock Co., supra,* decided nearly half a century after the enactment of the 1902 statute.[5]

The New Melones Dam, which this litigation concerns, is part of the California Central Valley Project, the largest reclamation project yet authorized under the 1902 Act.[6] The Dam, which will impound 2.4 million acre-feet of water of California's Stanislaus River, has the multiple purposes of flood control, irrigation, municipal use, industrial use, power, recreation, water-quality control, and the protection of fish and wildlife. The waters of the Stanislaus River that will be impounded behind the New Melones Dam arise and flow solely in California.

---

[5] Section 8 of the 1902 Reclamation Act has been mentioned in only seven cases decided by this Court. See *Ide* v. *United States,* 263 U. S. 497 (1924); *Nebraska* v. *Wyoming,* 295 U. S. 40 (1935); *Nebraska* v. *Wyoming,* 325 U. S. 589 (1945); *United States* v. *Gerlach Live Stock Co.,* 339 U. S. 725 (1950); *Ivanhoe Irrigation District* v. *McCracken,* 357 U. S. 275 (1958); *City of Fresno* v. *California,* 372 U. S. 627 (1963); *Arizona* v. *California,* 373 U. S. 546 (1963).

[6] The New Melones Dam was authorized by the Flood Control Acts of 1944 and 1962, 58 Stat. 901, 76 Stat. 1191. As in the case of all other reclamation projects, Congress specifically directed that the Dam be constructed and operated "pursuant to the Federal reclamation laws," 76 Stat. 1191, the principal one of which is the Reclamation Act of 1902.

The United States Bureau of Reclamation, as it has with every other federal reclamation project, applied for a permit from the appropriate state agency, here the California State Water Resources Control Board, to appropriate the water that would be impounded by the Dam and later used for reclamation.[7] After lengthy hearings, the State Board found that unappropriated water was available for the New Melones Dam during certain times of the year. Although it therefore approved the Bureau's applications, the State Board attached 25 conditions to the permit. California State Water Resources Control Board, Decision 1422 (Apr. 14, 1973). The most important conditions prohibit full impoundment until the Bureau is able to show firm commitments, or at least a specific plan, for the use of the water.[8] The State Board

[7] Under California law, any person who wishes to appropriate water must apply for a permit from the State Water Resources Control Board. Cal. Water Code Ann. §§ 1201 and 1225 (West 1971). The Board is to issue a permit only if it determines that unappropriated water is available and that the proposed use is both "reasonable" and "beneficial" and best serves "the public interest." §§ 1240, 1255, and 1375; Cal. Const., Art. 10, § 2. In determining whether to issue a permit, the Board is to consider not only the planned use of the water but also alternative uses, including enhancement of water quality, recreation, and the preservation of fish and wildlife. Cal. Water Code Ann. §§ 1242.5, 1243, and 1257 (West 1971). The Board can also impose such conditions in the permit as are necessary to insure the "reasonable" and "beneficial" use of the water and to protect "the public interest." §§ 1253 and 1391.

[8] Other conditions prohibit collection of water during periods of the year when unappropriated water is unavailable; require that a preference be given to water users in the water basin in which the New Melones Dam is located; require storage releases to be made so as to maintain maximum and minimum chemical concentrations in the San Joaquin River and protect fish and wildlife; require the United States to provide means for the release of excess waters and to clear vegetation and structures from the reservoir sites; require the filing of additional reports and studies; and provide for access to the project site by the State Board and the public. Still other conditions reserve jurisdiction to the Board to impose further conditions on the appropriations if necessary to protect the "beneficial use"

concluded that without such a specific plan of beneficial use the Bureau had failed to meet the California statutory requirements for appropriation.

"The limited unappropriated water resources of the State should not be committed to an applicant in the absence of a showing of his actual need for the water within a reasonable time in the future. When the evidence indicates, as it does here, that an applicant already has a right to sufficient water to meet his needs for beneficial use within the foreseeable future, rights to additional water should be withheld and that water should be reserved for other beneficial uses." *Id.*, at 16.

## II

The history of the relationship between the Federal Government and the States in the reclamation of the arid lands of the Western States is both long and involved, but through it runs the consistent thread of purposeful and continued deference to state water law by Congress. The rivers, streams, and lakes of California were acquired by the United States under the 1848 Treaty of Guadalupe Hidalgo with the Republic of Mexico, 9 Stat. 922. Within a year of that treaty, the California gold rush began, and the settlers in this new land quickly realized that the riparian doctrine of water rights that had served well in the humid regions of the East would not work in the arid lands of the West. Other settlers coming into the intermountain area, the vast basin and range country which lies between the Rocky Mountains on the east and the Sierra Nevada and Cascade Ranges on the west, were forced to the same conclusion. In its place, the doctrine of prior appropriation, linked to beneficial use of the water, arose through local customs, laws,

---

of the water involved. The United States did not challenge any of the conditions under state law, but instead filed the federal declaratory action that is now before us.

and judicial decisions. Even in this early stage of the development of Western water law, before many of the Western States had been admitted to the Union, Congress deferred to the growing local law. Thus, in *Broder* v. *Water Co.*, 101 U. S. 274 (1879), the Court observed that local appropriation rights were "rights which the government had, by its conduct, recognized and encouraged and was bound to protect." *Id.*, at 276.

In 1850, California was admitted as a State to the Union "on an equal footing with the original States in all respects whatever." 9 Stat. 452. While § 3 of the Act admitting California to the Union specifically reserved to the United States all "public lands" within the limits of California, no provision was made for the unappropriated waters in California's streams and rivers. One school of legal commentators held the view that, under the equal-footing doctrine, the Western States, upon their admission to the Union, acquired exclusive sovereignty over the unappropriated waters in their streams. In 1903, for example, one leading expert on reclamation and water law observed that "[i]t has heretofore been assumed that the authority of each State in the disposal of the water-supply within its borders was unquestioned and supreme, and two of the States have constitutional provisions asserting absolute ownership of all water-supplies within their bounds." E. Mead, Irrigation Institutions 372 (1903).[9] Such commentators were not without some support from language

---

[9] Dr. Elwood Mead was Chief of Irrigation Investigations for the Department of Agriculture at the time of his treatise's publication. Dr. Mead was a principal witness before Congress during the hearings on the Reclamation Act of 1902 and later became Commissioner of Reclamation, serving in that position from 1924 until his death in 1936.

Three Western States have adopted constitutional provisions asserting absolute ownership over the waters in their States. See Colo. Const., Art. 16, § 5; N. D. Const., Art. 17, § 210; Wyo. Const., Art. 8, § 1. Other States have asserted ownership by statute. See, *e. g.*, Idaho Code § 42–101 (1977). The courts of these States have upheld these provisions on the

in contemporaneous decisions of this Court. See S. Wiel, Water Rights in the Western States §§ 40–43, pp. 84–95 (2d ed. 1908). Thus, in *Kansas* v. *Colorado,* 206 U. S. 46 (1907), the Court noted:

"While arid lands are to be found mainly, if not only in the Western and newer States, yet the powers of the National Government within the limits of those States are the same (no greater and no less) than those within the limits of the original thirteen.

.    .    .    .    .

"In the argument on the demurrer counsel for plaintiff endeavored to show that Congress had expressly imposed the common law on all this territory prior to its formation into States. . . . But when the States of Kansas and Colorado were admitted into the Union they were admitted with the full powers of local sovereignty which belonged to other States, *Pollard* v. *Hagan,* [3 How. 212]; *Shively* v. *Bowlby,* [152 U. S. 1]; *Hardin* v. *Shedd,* 190 U. S. 508, 519; and Colorado by its legislation has recognized the right of appropriating the flowing waters to the purposes of irrigation." *Id.,* at 92 and 95.

And see *United States* v. *Rio Grande Dam & Irrig. Co.,* 174 U. S. 690, 702–703, and 709 (1899).

As noted earlier, reclamation of the arid lands began almost immediately upon the arrival of pioneers to the Western States. Huge sums of private money were invested in systems to transport water vast distances for mining, agriculture, and ordinary consumption. Because a very high percentage of land in the West belonged to the Federal Government, the canals and ditches that carried this water frequently crossed

ground that the States gained absolute dominion over their nonnavigable waters upon their admission to the Union. See, *e. g., Stockman* v. *Leddy,* 55 Colo. 24, 27–29, 129 P. 220, 221–222 (1912); *Farm Investment Co.* v. *Carpenter,* 9 Wyo. 110, 61 P. 258 (1900).

federal land. In 1862, Congress opened the public domain to homesteading. Homestead Act of 1862, 12 Stat. 392. And in 1866, Congress for the first time expressly opened the mineral lands of the public domain to exploration and occupation by miners. Mining Act of 1866, ch. 262, 14 Stat. 251. Because of the fear that these Acts might in some way interfere with the water rights and systems that had grown up under state and local law, Congress explicitly recognized and acknowledged the local law:

> "[W]henever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same." § 9, 14 Stat. 253.

The Mining Act of 1866 was not itself a grant of water rights pursuant to federal law. Instead, as this Court observed, the Act was " 'a voluntary recognition of a preëxisting right of possession, constituting a valid claim to its continued use.' " *United States* v. *Rio Grande Dam & Irrig. Co., supra,* at 705. Congress intended "to recognize as valid the customary law with respect to the use of water which had grown up among the occupants of the public land under the peculiar necessities of their condition." [10] *Basey* v. *Gallagher,* 20 Wall. 670, 684 (1875). See *Broder* v. *Water Co., supra,* at 276; *Jennison* v. *Kirk,* 98 U. S. 453, 459–461 (1879).[11]

---

[10] Senator Stewart, the most vocal of the 1866 Act's supporters, noted during debate that § 9 *"confirms* the rights to the use of water . . . as established by local law and the decisions of the courts. In short, it proposes no new system, but *sanctions, regulates, and confirms a system to which the people are devotedly attached."* Cong. Globe, 39th Cong., 1st Sess., 3227 (1866) (emphasis added).

[11] Four years later, in the Act of July 9, 1870, 16 Stat. 218, Congress reaffirmed that occupants of federal public land would be bound by state

In 1877, Congress took its first step toward encouraging the reclamation and settlement of the public desert lands in the West and made it clear that such reclamation would generally follow state water law. In the Desert Land Act of 1877, Congress provided for the homesteading of arid public lands in larger tracts

> "by [the homesteader's] conducting water upon the same, within the period of three years [after filing a declaration to do so], *Provided however* that the right to the use of water by the person so conducting the same . . . shall not exceed the amount of water actually appropriated, and necessarily used for the purpose of irrigation and reclamation: *and all surplus water over and above such actual appropriation and use, together with the water of all, lakes, rivers and other sources of water supply upon the public lands and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation, mining and manufactuing purposes subject to existing rights."* Ch. 107, 19 Stat. 377 (emphasis added).

This Court has had an opportunity to construe the 1877 Desert Land Act before. In *California Oregon Power Co.* v. *Beaver Portland Cement Co.,* 295 U. S. 142 (1935), Mr. Justice Sutherland[12] explained that, through this language, Congress

---

water law, by providing that "all patents granted, or preemption or homesteads allowed, shall be subject to any vested and accrued water rights." The effect of the 1866 and 1870 Acts was not limited to rights previously acquired. "They reach[ed] into the future as well, and approve[d] and confirm[ed] the policy of appropriation for a beneficial use, as recognized by local rules and customs, and the legislation and judicial decisions of the arid-land states, as the test and measure of private rights in and to the non-navigable waters on the public domain." *California Oregon Power Co.* v. *Beaver Portland Cement Co.,* 295 U. S. 142, 155 (1935).

[12] Mr. Justice Sutherland had grown up in Utah and was very familiar with the Westerners' efforts to tame the desert. Elected to Congress in

"effected a severance of all waters upon the public domain, not theretofore appropriated, from the land itself." *Id.,* at 158. The nonnavigable waters thereby severed were "reserved for the use of the public under the laws of the states and territories." *Id.,* at 162. Congress' purpose was not to federalize the prior-appropriation doctrine already evolving under local law. Quite the opposite:

> "What we hold is that following the act of 1877, if not before, all non-navigable waters then a part of the public domain became *publici juris,* subject to the plenary control of the designated states, including those since created out of the territories named, with the right in each to determine for itself to what extent the rule of appropriation or the common-law rule in respect of riparian rights should obtain. For since 'Congress cannot enforce either rule upon any state,' *Kansas* v. *Colorado,* 206 U. S. 46, 94, the full power of choice must remain with the state. The Desert Land Act does not bind or purport to bind the states to any policy. It simply recognizes and gives sanction, in so far as the United States and its future grantees are concerned, to the state and local doctrine of appropriation, and seeks to remove what otherwise might be an impediment to its full and successful operation. See *Wyoming* v. *Colorado,* 259 U. S. 419, 465." *Id.,* at 163–164.

See also *Gutierres* v. *Albuquerque Land & Irrig. Co.,* 188 U. S. 545, 552–553 (1903); *Ickes* v. *Fox,* 300 U. S. 82, 95 (1937); *Brush* v. *Commissioner,* 300 U. S. 352, 367 (1937).

---

1900, Sutherland was assigned to the Committee on Irrigation. According to his biographer, Sutherland's "intimate knowledge of the water problem in the West enabled him to make a conspicuous contribution" in this assignment. J. Paschal, Mr. Justice Sutherland: A Man Against the State 43 (1951). Sutherland was one of the principal participants in the formulation of the Reclamation Act of 1902. *Id.,* at 44.

Congress next addressed the task of reclaiming the arid lands of the West 11 years later. The opening of the arid lands to homesteading raised the specter that settlers might claim lands more suitable for reservoir sites or other irrigation works, impeding future reclamation efforts. Congress addressed this problem in the Act of Oct. 2, 1888, 25 Stat. 527, which provided:

> "[A]ll the lands which may hereafter be designated or selected by such United States surveys for sites for reservoirs, ditches or canals for irrigation purposes and all the lands made susceptible of irrigation by such reservoirs, ditches or canals are from this time henceforth hereby reserved from sale as the property of the United States, and shall not be subject after the passage of this act, to entry, settlement or occupation until further provided by law."

Unfortunately, this language, which had been hastily drafted and passed, had the practical effect of reserving all of the public lands in the West from settlement.[13] As a result, "there came a perfect storm of indignation from the people of the West, which resulted in the prompt repeal of the extraordinary [1888] provision." 29 Cong. Rec. 1955 (1897) (statement of Cong. McRae). In the Act of Aug. 30, 1890, 26 Stat. 391, Congress repealed the 1888 provision except insofar as it reserved reservoir sites. Then, in the Act of Mar. 3, 1891, 26 Stat. 1101, as amended, 43 U. S. C. § 946, Congress provided for rights-of-way across the public lands to be used by "any canal or ditch company formed for the purpose of irrigation." The apparent purpose of the 1890 and 1891 Acts was to reserve reservoir sites from settlement but to open them for use in reclamation projects.[14] As before, Congress expressly indi-

---

[13] See 29 Cong. Rec. 1948 (1897) (discussion by Cong. Lacey); *id.*, at 1955 (discussion by Cong. McRae).

[14] *Ibid.* And see Report to the Secretary of the Interior on the Blue

cated that the reclamation would be controlled by state water law: [15]

> "[T]he right of way through the public lands and reservations of the United States is hereby granted . . . for the purpose of irrigation . . . , to the extent of the ground occupied by the water of the reservoir and of the canal and its laterals . . . ; *Provided,* That . . . *the privilege herein granted shall not be construed to interfere with the control of water for irrigation and other purposes under authority of the respective States or Territories.*" 26 Stat. 1101 (emphasis added).

The Secretary of the Interior, unfortunately, interpreted the 1890 and 1891 Acts as reserving governmentally surveyed reservoir sites *from* use rather than *for* use. Congress rectified this interpretation in the Act of Feb. 26, 1897, ch. 335, 29 Stat. 599, which provided:

> "[A]ll reservoir sites reserved or to be reserved shall be open to use and occupation under the right-of-way Act of March third, eighteen hundred and ninety-one. And any State is hereby authorized to improve and occupy such reservoir sites to the same extent as an individual or

---

Water Land & Irrigation Co. by the Acting Commissioner of the General Land Office, Nov. 23, 1895.

[15] Congress' intent was reflected in contemporary administrative decisions. According to the Department of the Interior, the 1891 Act "relegate[d] the matter of appropriation and control of all natural sources of water supply in the state of California to the authority of that state. The act of March 3, 1891, deals only with the right of way over the public lands to be used for the purposes of irrigation, leaving the disposition of the water to the state." *H. H. Sinclair,* 18 I. D. 573, 574 (1894). In a circular of the same period explaining the 1891 Act, the Interior Department noted that the "control of the flow and use of the water is . . . a matter exclusively under State or Territorial control, the matter of administration within the jurisdiction of this Department being limited to the approval of maps carrying the right of way over the public lands." 18 I. D. 168, 169–170 (1894).

private corporation, under such rules and regulations as the Secretary of the Interior may prescribe: *Provided,* That the charges for water coming in whole or part from reservoir sites used or occupied under the provisions of this Act shall always be subject to the control and regulation of the respective States and Territories in which such reservoirs are in whole or part situate."

The final provision of the 1897 Act was proposed as a floor amendment by Representative, later Speaker, Cannon to expressly preserve States' control over reclamation within their borders. It was clearly the opinion of a majority of the Congressmen who spoke on the bill, however, that such an amendment was unnecessary except out of an excess of caution.[16] According to Congressman Lacey, Chairman of the House Committee on Public Lands and a principal sponsor of the

---

[16] "A reservoir site without water is entirely useless. The water is the particular thing in question, and the waters are controlled by the States through which they flow, and not by the United States of America. These are surface waters, the waters of small streams not navigable, and the States control them.

"[T]he United States does not control the water. It controls only the reservoir sites in which the water may be collected. The water is under the control of the States." 29 Cong. Rec. 1948–1949 (1897) (Cong. Lacey). "It is the State alone that owns and controls the water, under the constitution of our States; and I suppose that is true under the laws of every State." *Id.,* at 1951 (Cong. Bell). "The amendment which has been proposed by the gentleman from Illinois [Mr. Cannon], and adopted, really serves no purpose, because it merely reenacts the existing law. It would be the law even if the act of 1891 were not in existence. The waters belong to the States. The United States Government has always recognized that, and the States have enacted legislation directly controlling the use of the waters." *Id.,* at 1952 (Cong. Shafroth). Only Congressman Terry, who unsuccessfully opposed the bill, suggested the contrary. In his view, the Federal Government could use its control of the land to regulate the price of the water stored. See *id.,* at 1949–1950.

1897 Act, the water through which the reclamation would be accomplished

> "does not belong to the [Federal] Government. The reservoirs in which the water is stored belong to the Government, but the water belongs to the States and will be controlled by them. The amendment proposed by the gentleman from Illinois [Mr. CANNON] relieves this measure from all possible doubt upon that subject. I think there could be no doubt anyhow, but this amendment takes away the possibility of any question being raised as to the right of the States and Territories to regulate and control the management and the price of the water." 29 Cong. Rec. 1952 (1897).

Congressman Lacey's statement found reflection in contemporaneous decisions of this Court holding that, with limited exceptions not relevant to reclamation, authority over intrastate waterways lies with the States. In *United States* v. *Rio Grande Dam & Irrig. Co.*, for example, New Mexico's authority to adopt a prior appropriation system of water rights for the Rio Grande River was challenged. The Court unhesitatingly held that "as to every stream within its dominion a State may change [the] common law rule and permit the appropriation of the flowing waters for such purposes as it deems wise." 174 U. S., at 702–703. The Court noted that there are two limitations to the State's exclusive control of its streams—reserved rights "so far at least as may be necessary for the beneficial uses of the government property," *id.*, at 703, and the navigation servitude. The Court, however, was careful to emphasize with respect to these limitations on the States' power that, except where the reserved rights or navigation servitude of the United States are invoked, the State has total authority over its internal waters. "Unquestionably the State . . . has a right to appropriate its waters, and the United States may not question such appropriation, unless thereby the navigability of the [river] be disturbed." *Id.*, at 709.

Similarly, in *Kansas* v. *Colorado*, 206 U. S. 46 (1907), the United States claimed that it had a right in the Arkansas River superior to that of Kansas and Colorado stemming from its power "to control the whole system of the reclamation of arid lands." The Court disagreed and held that state reclamation law must prevail. The United States, of course, could appropriate water and build projects to reclaim its own public lands. "As to those lands within the limits of the States, at least of the Western States, the National Government is the most considerable owner and has power to dispose of and make all needful rules and regulations respecting its property." *Id.*, at 92. But federal legislation could not "override state laws in respect to the general subject of reclamation." *Ibid.* "[E]ach State has full jurisdiction over the lands within its borders, including the beds of streams and other waters." *Id.*, at 93. With respect to the question that had been presented in *Rio Grande Dam & Irrig. Co.*, the Court reaffirmed that each State "may determine for itself whether the common law rule in respect to riparian rights or that doctrine which obtains in the arid regions of the West of the appropriation of waters for the purposes of irrigation shall control. Congress cannot enforce either rule upon any State." 206 U. S., at 94.

### III

It is against this background that Congress passed the Reclamation Act of 1902. With the help of the 1891 and 1897 Acts, private and state reclamation projects had gone far toward reclaiming the arid lands,[17] but massive projects were now needed to complete the goal and these were beyond the means of private companies and the States. In 1900, therefore, all of the major political parties endorsed federal funding of reclamation projects. While the Democratic Party's platform specified none of the attributes of a federal program other than to recommend that it be "intelligent,"

---

[17] See A. Golzé, Reclamation in the United States 9–23 (1961).

K. Porter & D. Johnson, National Party Platforms 115 (2d ed. 1961), the Republicans specifically recommended that the reclamation program "reserv[e] control of the distribution of water for irrigation to the respective States and territories." *Id.*, at 123. In his first message to Congress after assuming the Presidency, Theodore Roosevelt continued the cry for national funding of reclamation and again recommended that state law control the distribution of water.[18]

As a result of the public demand for federal reclamation funding, a bill was introduced into the 57th Congress to use the money from the sale of public lands in the Western States to build reclamation projects in those same States. The projects would be built on federal land and the actual construction and operation of the projects would be in the hands of the Secretary of the Interior. But the Act clearly provided that state water law would control in the appropriation and later distribution of the water. As originally introduced, § 8 of the Reclamation Act provided: [19]

"[N]othing in this act shall be construed as affecting or intended to affect or to in any way interfere with

---

[18] "The pioneer settlers on the arid public domain chose their homes along streams from which they could themselves divert the water to reclaim their holdings. Such opportunities are practically gone. There remain, however, vast areas of public land which can be made available for homestead settlement, but only by reservoirs and main-line canals impracticable for private enterprise. These irrigation works should be built by the National Government. The lands reclaimed by them should be reserved by the Government for actual settlers, and the cost of construction should so far as possible be repaid by the land reclaimed. *The distribution of the water, the division of the streams among irrigators, should be left to the settlers themselves in conformity with State laws and without interference with those laws or with vested rights.*" H. R. Doc. No. 1, 57th Cong., 1st Sess., xxviii (1901) (emphasis added).

[19] In the House, § 8 was amended so as to provide, rather than that state law "shall govern and control," that "the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with" state law "relating to the control, appropriation, use, or distribution of water." According to Representative Newlands, who had introduced

the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation; but State and Territorial laws shall govern and control in the appropriation, use, and distribution of the waters rendered available by the works constructed under the provisions of this act: *Provided,* That the right to the use of water acquired under the provisions of this act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right."

From the legislative history of the Reclamation Act of 1902, it is clear that state law was expected to control in two important respects. First, and of controlling importance to this case, the Secretary would have to appropriate, purchase, or condemn necessary water rights in strict conformity with state law. According to Representative Mondell, the principal sponsor of the reclamation bill in the House, once the Secretary determined that a reclamation project was feasible and that there was an adequate supply of water for the project, "the Secretary of the Interior would proceed to make the appropriation of the necessary water *by giving the notice and complying with the forms of law of the State or Territory in which the works were located."* 35 Cong. Rec. 6678 (1902) (emphasis added). The Secretary of the Interior could not take any action in appropriating the waters of the state streams "which could not be undertaken by an individual or corporation if it were in the position of the Government as regards the ownership of its lands." H. R. Rep. No. 794, 57th Cong., 1st Sess., 7–8 (1902). Thus, in response to the

---

the original bill in the House, the original bill was "identical in its provisions, though differing somewhat in phraseology," to the ultimate Act. 35 Cong. Rec. 6673 (1902). The bill may have been amended to make clear the congressional intent that state law could not override the specific directives of Congress that water rights would be appurtenant to the land and would not be sold to tracts of greater than 160 acres. See *id.,* at 6674. See generally n. 21, *infra.*

statement of an opponent to the bill that the Secretary would be allowed to condemn water even if in violation of state law, Representative Mondell briskly responded:

"Whereabouts does the gentleman find any such provision as he is arguing? Whereabouts in the bill is there anything that attempts to give the Federal Government any right to condemn or to take any water right or do anything which an individual could not do? Will the gentleman point out any place or any provision for the Federal Government to do anything that I could not do if I owned the public land?

"Mr. RAY of New York. Do you say there is nothing in this bill that provides for condemnation?

"Mr. MONDELL. *The bill provides explicitly that even an appropriation of water can not be made except under State law.*" 35 Cong. Rec. 6687 (1902) (emphasis added).[20]

---

[20] Earlier in the debates, Representative Mondell observed that under the Reclamation Act the Secretary of the Interior would only have the power to condemn water rights in compliance with state law. "In some of the arid States . . . water rights can be condemned for the purposes contemplated in this bill, and in such States the Secretary of the Interior would have as much authority to condemn as any other individual, and no more. Where the State laws do not recognize the right to condemn property for the purposes contemplated in the act, it will not be condemned, and there is the end of it . . . . [W]here the State laws do not authorize condemnation, and projects can not be carried on without condemnation, those particular projects will not be undertaken, and others, where there is no such obstacle, will." 35 Cong. Rec. 6680 (1902).

In response to Representative Mondell's statement, Representative Ray asked whether he had "forgotten . . . that they have in this bill a provision which purports to confer upon the Secretary of the Interior power to condemn water and water rights for the purpose of carrying out this scheme." Representative Mondell responded that the power existed only "[w]herever the State law gives him authority to do so." *Id.,* at 6688.

Representative Sutherland also noted that the "Secretary must proceed in the condemnation proceedings under the laws of the State." *Id.,* at 6769.

Second, once the waters were released from the Dam, their distribution to individual landowners would again be controlled by state law. As explained by Senator Clark of Wyoming, one of the principal supporters of the reclamation bill in the Senate, "the control of waters after leaving the reservoirs shall be vested in the States and Territories through which such waters flow." *Id.,* at 2222. As Senator Clark went on to explain:

> "[I]t is right and proper that the various States and Territories should control in the distribution. The conditions in each and every State and Territory are different. What would be applicable in one locality is totally and absolutely inapplicable in another. . . . In each and every one of the States and Territories affected, after a long series of experiments, after a due consideration of conditions, there has arisen a set of men who are especially qualified to deal with local conditions.
>
> "Every one of these States and Territories has an accomplished and experienced corps of engineers who for years have devoted their energies and their learning to a solution of this problem of irrigation in their individual localities. To take from these experienced men, to take from the legislatures of the various States and Territories, the control of this question at the present time would be something little less than suicidal. They are the men qualified to deal with the question, the laws are written upon their statute books and read of all men, and in every one of these States and Territories the laws have been passed that most diligently regard the rights of the settler and of the farmer . . . ." *Ibid.*

As Representative Sutherland, later to be a Justice of this Court, succinctly put it, "if the appropriation and use were not under the provisions of the State law the utmost confusion would prevail." *Id.,* at 6770. Different water rights in

the same State would be governed by different laws and would frequently conflict.[21]

A principal motivating factor behind Congress' decision to

---

[21] Congress did not intend to relinquish total control of the actual distribution of the reclamation water to the States. Congress provided in § 8 itself that the water right must be appurtenant to the land irrigated and governed by beneficial use, and in § 5 Congress forbade the sale of reclamation water to tracts of land of more than 160 acres. It is conceivable, of course, that Congress may not have intended to actually override state law when inconsistent with these other provisions but instead only intended to exercise a veto power over any reclamation project that, because of state law, could not be operated in compliance with these provisions. A project simply would not be built by the Federal Government if such a conflict existed. As the House Report explained the workings of the 160-acre limitation and the appurtenance requirement:

"The character of the water rights contemplated being clearly defined, the Secretary of the Interior would not be authorized to begin construction of works for the irrigation of lands in any State or Territory until satisfied that the laws of said State or Territory fully recognized and protected water rights of the character contemplated. This feature of the bill will undoubtedly tend to uniformity and perfection of water laws throughout the region affected." H. R. Rep. No. 794, 57th Cong., 1st Sess., 6 (1902).

Some support for this interpretation of the congressional intent can also be found in contemporaneous administrative material of the Department of the Interior. See, e. g., Department of the Interior, Proceedings of First Conference of Engineers of the Reclamation Service 103 (1904) ("Before the filing of the first notice of appropriation of water in any State the matter of the advisability of making such filing should be submitted to the chief engineer, because some of the State laws may be such that it is impossible to comply with them in conducting operations under the reclamation act"); Department of the Interior, Second Annual Report of the Reclamation Service 33 (1904) ("[C]areful study must be made of the effect of State laws upon each project under consideration in that particular State. It appears probable that in some of the States radical changes in the laws must be made before important projects can be undertaken").

In previous cases interpreting § 8 of the 1902 Reclamation Act, however, this Court has held that state water law does not control in the distribution of reclamation water *if* inconsistent with other congressional directives to the Secretary. See *Ivanhoe Irrigation District* v. *McCracken,*

defer to state law was thus the legal confusion that would arise if federal water law and state water law reigned side by side in the same locality. Congress also intended to "follo[w] the well-established precedent in national legislation of recognizing local and State laws relative to the appropriation and distribution of water." *Id.*, at 6678 (Cong. Mondell). As Representative Mondell noted after reviewing the legislation discussed in Part II of this opinion: "Every act since that of April 26, 1866, has recognized local laws and customs appertaining to the appropriation and distribution of water used in irrigation, and it has been deemed wise to continue our policy in this regard." *Id.*, at 6679.[22]

Both sponsors and opponents of the Reclamation Act also expressed constitutional doubts as to Congress' power to override the States' regulation of waters within their borders. Congress was fully aware that the Supreme Court had "in

---

357 U. S. 275 (1958); *City of Fresno* v. *California*, 372 U. S. 627 (1963). We believe that this reading of the Act is also consistent with the legislative history and indeed is the preferable reading of the Act. See n. 25, *infra*. Whatever the intent of Congress with respect to state control over the distribution of water, however, Congress in the 1902 Act intended to follow state law as to appropriation of water and condemnation of water rights. Under the 1902 Act, the Secretary of the Interior was authorized in his discretion to "locate and construct" reclamation projects. As the legislative history of the 1902 Act convincingly demonstrates, however, if state law did not allow for the appropriation or condemnation of the necessary water, Congress did not intend the Secretary of the Interior to initiate the project. Subsequent legislation authorizing a specific project may by its terms signify congressional intent that the Secretary condemn or be permitted to appropriate the necessary water rights for the project in question, but no such legislation was considered by the Court of Appeals in its opinion in this case. That court will be free to consider arguments by the Government to this effect on remand. See Part V, *infra*.

[22] In addition to the legislation discussed in Part II of this opinion, Congressman Mondell also cited to the National Forest Act of 1897, 30 Stat. 36, "provid[ing] for the use of waters on such reserves 'under the laws of the State wherein such forest reservations are situated.'" 35 Cong. Rec. 6679 (1902).

several decisions recognized the right of the State to regulate and control the use of water within its borders." *Ibid.* (Cong. Mondell). According to the House Report, "Section 8 *recognizes State control over waters of nonnavigable streams* such as are used in irrigation." H. R. Rep. No. 794, 57th Cong., 1st Sess., 6 (1902) (emphasis added).[23]

## IV

For almost half a century, this congressionally mandated division between federal and state authority worked smoothly. No project was constructed without the approval of the Secretary of the Interior, and the United States through this official preserved its authority to determine how federal funds should be expended. But state laws relating to water rights were observed in accordance with the congressional directive contained in § 8 of the Act of 1902. In 1958, however, the first of two cases was decided by this Court in which private landowners or municipal corporations contended that state water law had the effect of overriding specific congressional directives to the Secretary of the Interior as to the operation of federal reclamation projects. In *Ivanhoe Irrigation District* v. *McCracken,* 357 U. S. 275, the Supreme Court of California decided that

---

[23] Opponents of the 1902 Reclamation Act also expressed doubt whether Congress could constitutionally override the States' regulation of waters within their borders:

"Again, to be clear, the United States as to its public lands in a State is only an owner with the rights of private ownership, the same as those of an individual. When territory is admitted into the Union as a State the sovereignty of the United States is surrendered to the new State and the sovereignty of the State attaches and becomes paramount as to every foot of soil, unless expressly reserved to the General Government, and subject to the right of that Government to condemn for a public use of the United States necessary to the performance of its governmental functions or to its preservation." H. R. Rep. No. 794, 57th Cong., 1st Sess., pt. 2 (Minority Views), 16–17 (1902).

See also *id.,* at 8; 35 Cong. Rec. 6687 (1902) (Cong. Ray).

California law forbade the 160-acre limitation on irrigation water deliveries expressly written into § 5 of the Reclamation Act of 1902, and that therefore, under § 8 of the Reclamation Act, the Secretary was required to deliver reclamation water without regard to the acreage limitation. Both the State of California and the United States appealed from this judgment, and this Court reversed it, saying:

"Section 5 is a specific and mandatory prerequisite laid down by the Congress as binding in the operation of reclamation projects, providing that '[n]o right to the use of water . . . shall be sold for a tract exceeding one hundred and sixty acres to any one landowner . . . .' Without passing generally on the coverage of § 8 in the delicate area of federal-state relations in the irrigation field, we do not believe that the Congress intended § 8 to override the repeatedly reaffirmed national policy of § 5." 357 U. S., at 291–292.

Five years later, in *City of Fresno* v. *California,* 372 U. S. 627 (1963), this Court affirmed a decision of the United States Court of Appeals for the Ninth Circuit holding that § 8 did not require the Secretary of the Interior to ignore explicit congressional provisions preferring irrigation use over domestic and municipal use.[24]

---

[24] "Section 9 (c) of the Reclamation Project Act of 1939 . . . provides: 'No contract relating to municipal water supply or miscellaneous purposes . . . shall be made unless, in the judgment of the Secretary [of the Interior], it will not impair the efficiency of the project for irrigation purposes.' . . . It therefore appears clear that Fresno has no preferential rights to contract for project water, but may receive it only if, in the Secretary's judgment, irrigation will not be adversely affected." 372 U. S., at 630–631.

The Court also concluded in a separate portion of its opinion: "§ 8 does not mean that state law may operate to prevent the United States from exercising the power of eminent domain to acquire the water rights of others. . . . Rather, the effect of § 8 in such a case is to leave to state

Petitioners do not ask us to overrule these holdings, nor are we presently inclined to do so.[25] Petitioners instead ask us to hold that a State may impose any condition on the "control, appropriation, use, or distribution of water" through a federal reclamation project that is not inconsistent with clear congressional directives respecting the project. Petitioners concede, and the Government relies upon, dicta in our cases that may point to a contrary conclusion. Thus, in *Ivanhoe,* the Court went beyond the actual facts of that case and stated:

> "As we read § 8, it merely requires the United States to comply with state law when, in the construction and operation of a reclamation project, it becomes necessary for it to acquire water rights or vested interests therein. . . . We read nothing in § 8 that compels the

law the definition of the property interests, if any, for which compensation must be made." *Id.,* at 630. Because no provision of California law was actually inconsistent with the exercise by the United States of its power of eminent domain, this statement was dictum. It also might have been apparent from examination of the congressional authorization of the Central Valley Project that Congress intended the Secretary to have the power to condemn any necessary water rights. We disavow this dictum, however, to the exent that it implies that state law does not control even where not inconsistent with such expressions of congressional intent.

[25] As discussed earlier in n. 21, it is at least arguable that Congress did not intend to override state water law when it was inconsistent with congressional objectives such as the 160-acre limitation, but intended instead to enforce those objectives simply by the Secretary's refusal to approve a project which could not be built or operated in accordance with them. This intent, however, is not clear, and Congress may have specifically amended § 8 to provide that state law could not override congressional directives with respect to a reclamation project. See n. 19, *supra. Ivanhoe* and *City of Fresno* read the legislative history of the 1902 Act as evidencing Congress' intent that specific congressional directives which were contrary to state law regulating distribution of water would override that law. Even were this aspect of *Ivanhoe res nova,* we believe it to be the preferable reading of the Act.

United States to deliver water on conditions imposed by the State." 357 U. S., at 291–292.

Like dictum was repeated in *City of Fresno, supra,* at 630, and in this Court's opinion in *Arizona* v. *California,* 373 U. S. 546 (1963), where the Court also said:

"The argument that § 8 of the Reclamation Act requires the United States in the delivery of water to follow priorities laid down by state law has already been disposed of by this Court in *Ivanhoe Irr. Dist.* v. *McCracken,* . . . and reaffirmed in *City of Fresno* v. *California* . . . . Since § 8 of the Reclamation Act did not subject the Secretary to state law in disposing of water in [*Ivanhoe*], we cannot, consistently with *Ivanhoe,* hold that the Secretary must be bound by state law in disposing of water under the Project Act." *Id.,* at 586–587.

While we are not convinced that the above language is diametrically inconsistent with the position of petitioners,[26] or that it squarely supports the United States, it undoubtedly goes further than was necessary to decide the cases presented to the Court. *Ivanhoe* and *City of Fresno* involved conflicts between § 8, requiring the Secretary to follow state law as to water rights, and other provisions of Reclamation Acts that placed specific limitations on how the water was to be distributed. Here the United States contends that it may ignore state law even if no explicit congressional directive conflicts with the conditions imposed by the California State Water Control Board.[27]

---

[26] Part of the Court's opinion in *Ivanhoe* indeed would appear to directly support petitioners' position. Thus, the Court concluded that under § 8 of the 1902 Reclamation Act the United States must "comply with state law when, in the construction and operation of a reclamation project, *it becomes necessary for it to acquire water rights* or vested interests therein." 357 U. S., at 291 (emphasis added).

[27] The State of California was an appellant in *Ivanhoe* and supported the decision of the Court of Appeals for the Ninth Circuit in *City of Fresno.*

In *Arizona* v. *California,* the States had asked the Court
to rule that state law would control in the distribution of
water from the Boulder Canyon Project, a massive multistate
reclamation project on the Colorado River.[28]   After review-
ing the legislative history of the Boulder Canyon Project Act,
43 U. S. C. § 617 *et seq.,* the Court concluded that because
of the unique size and multistate scope of the Project, Con-
gress did not intend the States to interfere with the Secretary's
power to determine with whom and on what terms water
contracts would be made.[29]   While the Court in rejecting the
States' claim repeated the language from *Ivanhoe* and *City of
Fresno* as to the scope of § 8, there was no need for it to
reaffirm such language except as it related to the singular
legislative history of the Boulder Canyon Project Act.

But because there is at least tension between the above-
quoted dictum and what we conceive to be the correct reading
of § 8 of the Reclamation Act of 1902, we disavow the dictum
to the extent that it would prevent petitioners from imposing
conditions on the permit granted to the United States which
are not inconsistent with congressional provisions authorizing
the project in question.   Section 8 cannot be read to require the
Secretary to comply with state law only when it becomes
necessary to purchase or condemn vested water rights.   That

---

[28] The Special Master agreed with the States that they had such power
under § 14 of the Project Act, 43 U. S. C. § 617m, which incorporated the
Reclamation Act of 1902, and § 18 of the Project Act, 43 U. S. C. § 617q,
which provided that nothing in the Act should be construed "as interfer-
ing with such rights as the States had on December 21, 1928, either to
the waters within their borders or to adopt such policies and enact such
laws as they deem necessary with respect to the appropriation, control,
and use of waters within their borders."   The Court disagreed, with three
Justices dissenting.

[29] Even though concluding that the power of the States was so limited,
the Court went on to note that the Project Act "plainly allows the States
to do things not inconsistent with the Project Act or with federal control
of the river."   373 U. S., at 588.

section does, of course, provide for the protection of vested water rights, but it also requires the Secretary to comply with state law in the "control, appropriation, use, or distribution of water." Nor, as the United States contends, does § 8 merely require the Secretary of the Interior to file a notice with the State of his intent to appropriate but to thereafter ignore the substantive provisions of state law. The legislative history of the Reclamation Act of 1902 makes it abundantly clear that Congress intended to defer to the substance, as well as the form, of state water law. The Government's interpretation would trivialize the broad language and purpose of § 8.

Indeed, until recently, it has been the consistent position of the Secretary of the Interior and the Bureau of Reclamation, who are together responsible for executing the provisions of the Reclamation Act of 1902, that in appropriating water for reclamation purposes the Bureau must comply with state law. The Bureau's operating instructions, for example, provide:

> "State and Federal law and policy establish the framework for project formulation. *Project plans must comply with State legal provisions or priorities for beneficial use of water* . . . . In some cases, . . . State laws . . . have been modified to meet specific conditions in the authorization of particular projects." U. S. Department of Interior, Bureau of Reclamation, Reclamation Instructions § 116.3.1 (1959) (emphasis added).

> *"The Reclamation Act recognizes the interests and rights of the States in the utilization and control of their water resources and requires the Bureau, in carrying out provisions of the Act, to proceed in conformity with State water laws.* Since the construction of a reservoir and the subsequent storage and release of water for beneficial purposes normally entails stream regulation, it is necessary to reach an understanding with the States regarding

reservoir operating limitations." *Id.*, § 231.5.1 (1957) (emphasis added).

With respect to the Central Valley Project, the Bureau advised Congress that " '[r]eclamation law . . . recognizes State water law and rights thereunder' " and that "Bureau filings on water are subject to State approval." 95 Cong. Rec. A961 (1949).[30]

Indeed, until the unnecessarily broad language of the Court's opinion in *Ivanhoe*, both the uniform practice of the Bureau of Reclamation and the opinions of the Court clearly supported petitioners' argument that they may impose any condition not inconsistent with congressional directive. In holding that the United States was not an indispensable party in *Nebraska* v. *Wyoming*, 295 U. S. 40 (1935), this Court observed:

"[T]he Secretary of the Interior, pursuant to the [1902] Act, applied to the state engineer of Wyoming and obtained from him permission . . . to appropriate waters, and was awarded a priority date. . . . All of the acts of the Reclamation Bureau in operating the reservoirs so as to impound and release waters of the river are subject to the authority of Wyoming.

. . . . .

"The bill alleges, and we know as matter of law [citing § 8 of the 1902 Reclamation Act], that the Secretary and his agents, acting by authority of the Reclamation Act and supplementary legislation, must obtain permits and priorities for the use of water from the State of Wyoming

---

[30] A remarkably similar history of administrative construction and advice to Congress was given weight in *United States* v. *Gerlach Live Stock Co.*, 339 U. S., at 735–736. Considerable weight must be accorded to these interpretations of the Reclamation Act by the agency charged with its operation. See *Zemel* v. *Rusk*, 381 U. S. 1 (1965); *Perkins* v. *Matthews*, 400 U. S. 379 (1971); *General Electric Co.* v. *Gilbert*, 429 U. S. 125 (1976).

in the same manner as a private appropriator or an irrigation district formed under the state law." *Id.,* at 42–43.

Ten years later, in its final decision in *Nebraska* v. *Wyoming,* 325 U. S. 589 (1945), the Court elaborated on its original observation:

"All of these steps make plain that [the Reclamation] projects were designed, constructed and completed according to the pattern of state law as provided in the Reclamation Act. We can say here what was said in *Ickes* v. *Fox,* [300 U. S. 82 (1937)]: 'Although the government diverted, stored and distributed the water, the contention of petitioner that thereby ownership of the water or water-rights became vested in the United States is not well founded. Appropriation was made not for the use of the government, but, under the Reclamation Act, for the use of the land owners; and by the terms of the law and of the contract already referred to, the water-rights became the property of the land owners, wholly distinct from the property right of the government in the irrigation works. . . . The government was and remained simply a carrier and distributor of the water . . . , with the right to receive the sums stipulated in the contracts as reimbursement for the cost of construction and annual charges for operation and maintenance of the works.'

.     .     .     .     .

"We have then a direction by Congress to the Secretary of the Interior to proceed in conformity with state laws in appropriating water for irrigation purposes. We have a compliance with that direction. . . ." *Id.,* at 613–615.

The United States suggests that, even if the Congress of 1902 intended the Secretary of the Interior to comply with state law, more recent legislative enactments have subjected reclamation projects "to a variety of federal policies that leave no room for state controls on the operation of a project or on

the choice of uses it will serve." [31]    Brief for United States 89.
While later Congresses have indeed issued new directives to
the Secretary, they have consistently reaffirmed that the
Secretary should follow state law in all respects not directly
inconsistent with these directives.    The Flood Control Act of
1944, 58 Stat. 888, for example, which first authorized the New
Melones Dam, provides that it is the "policy of the Congress
to recognize the interests and rights of the States in determin-
ing the development of watersheds within their borders and
likewise their interests and rights in water utilization and
control."    Perhaps the most eloquent expression of the need
to observe state water law is found in the Senate Report
on the McCarran Amendment, 43 U. S. C. § 666 (a), which
subjects the United States to state-court jurisdiction for gen-
eral stream adjudications:

> "In the arid Western States, for more than 80 years, the
> law has been the water above and beneath the surface of
> the ground belongs to the public, and the right to the use
> thereof is to be acquired from the State in which it is
> found, which State is vested with the primary control
> thereof.
>
> .          .          .          .          .
>
> "Since it is clear that the States have the control of
> water within their boundaries, it is essential that each and
> every owner along a given water course, including the
> United States, must be amenable to the law of the State,

---

[31] It is worth noting that the original Reclamation Act of 1902 was not
devoid of such directives.    That Act provided that the charges for water
should "be determined with a view of returning to the reclamation fund the
estimated cost of construction of the project, and . . . be apportioned
equitably" and that water rights should "be appurtenant to the land irri-
gated, and beneficial use . . . the basis, the measure, and the limit of the
right"; the Act also forbade sales to tracts of more than 160 acres.
Despite these restraints on the Secretary, however, it is clear from the
language and legislative history of the 1902 Act that Congress intended
state law to control where it was not inconsistent with the above provisions.

if there is to be a proper administration of the water law as it has developed over the years." S. Rep. No. 755, 82d Cong., 1st Sess., 3, 6 (1951).

## V

Because the District Court and the Court of Appeals both held that California could not impose any conditions whatever on the United States' appropriation permit, those courts did not reach the United States' alternative contention that the conditions actually imposed are inconsistent with congressional directives as to the New Melones Dam. Nor did they reach California's contention that the United States is barred by principles of collateral estoppel from challenging the consistency of the permit conditions. Assuming, *arguendo*, that the United States is still free to challenge the consistency of the conditions, resolution of their consistency may well require additional factfinding. We therefore reverse the judgment of the Court of Appeals and remand for further proceedings consistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE WHITE, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

Early in its opinion, the majority identifies the critical issues in this case as to the "meaning and scope" of § 8 of the Reclamation Act of 1902. In quest of suitable answers, the majority launches on an extensive survey of 19th- and 20th-century statutory and judicial precedents that partially delineate the relationship between federal and state law with respect to the conservation and use of the water resources of the Western States. At the end of this Odyssean journey, the conclusion seems to be that under the relevant federal statutes containing the reclamation policy of the United States, the intention of the Congress has been to recognize local and state law as controlling both the "appropriation and distribution"

of the water resources that are the object of federal reclamation projects.

Straightaway, however, and with obvious reluctance, it is conceded in a footnote that § 8 does not really go so far and that Congress, after all, "did not intend to relinquish total control of the actual distribution of the reclamation water to the States." *Ante,* at 668 n. 21. Where following state law would be inconsistent with other provisions of the Reclamation Act or with congressional directives to the Secretary contained in other statutes, § 8 and local law must give way.[1] Otherwise, however, it is insisted that by virtue of § 8, state policy must govern federal projects. The next section of the majority opinion is devoted to defending this conclusion and to explaining why it refuses to follow our prior cases construing § 8 much more narrowly than the present temporal majority finds acceptable.

Meanwhile, the opinion has also concluded that because of § 8, the United States may not acquire water rights by appropriation or condemnation except in accordance with state law. If, for example, particular water rights are not subject to condemnation under state law by private interests, neither may they be taken by the United States. This issue, going to the acquisition by the United States of water rights

---

[1] Section 8 of the Reclamation Act, 32 Stat. 390, now 43 U. S. C. §§ 372, 383, provided:

"[N]othing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof: *Provided,* That the right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right."

by eminent domain, is not among the questions presented in this case, and the views expressed in this respect are no sounder and no less inconsistent with our prior cases than is the majority's view that the distribution of water developed by federal reclamation projects is to be governed by state law.

I

Four of the five major cases bearing on the construction of § 8 have arisen out of the Central Valley Reclamation Project, a massively expensive reclamation undertaking which aimed at redistributing the water in California's Central Valley, which the State was unable to finance and which the Federal Government eventually undertook.[2] The salient features of the project, which need not be repeated, have been outlined in the Court's cases. *United States* v. *Gerlach Live Stock Co.,* 339 U. S. 725 (1950); *Ivanhoe Irrigation District* v. *McCracken,* 357 U. S. 275 (1958); *Dugan* v. *Rank,* 372 U. S. 609 (1963); and *City of Fresno* v. *California,* 372 U. S. 627 (1963). One of the project's principal components is the Friant Dam, which interrupted the flow of the upper San Joaquin River, the impounded waters being distributed to irrigate lands not theretofore served by San Joaquin water. To supply the needs of the lower river basin, water was imported from the Sacramento River Valley to the north. The difficulty was that Sacramento water was delivered to the San Joaquin some 60 miles below the Friant Dam. The riparian owners and others along this section of the river, the flow of which would at the very least be severely diminished, naturally sought their remedy.

---

[2] As the United States said in its brief in *Ivanhoe Irrigation District* v. *McCracken,* 357 U. S. 275 (1958), the Central Valley Project was "the largest single undertaking pursuant to the federal reclamation program. The project was adopted by the United States at the instance of the State of California, at an estimated cost to the United States of more than $800,000,000." Brief for United States as *Amicus Curiae,* O. T. 1957, Nos. 122–125, p. 28.

In *Gerlach, supra,* the Court of Claims had made compensation awards to the owners of certain riparian grasslands that had been watered by the seasonal overflow along this section of the river. This overflow would no longer take place. The United States insisted that the project was an undertaking under the commerce power to control navigation and that the Government need not compensate for the destruction of riparian rights. The Court disagreed, concluding that Congress, in an exercise of its constitutional power to tax and spend for the general welfare, had elected to proceed under the reclamation laws and to pay for any vested rights taken by the Government: "[W]hether required to do so or not, Congress elected to recognize any state-created rights and to take them under its power of eminent domain." 339 U. S., at 739 (footnote omitted).

Since the closing of the Dam would terminate the annual inundation of the lands involved, the inquiry became whether there had been a taking of any water rights defined and recognized by state law. After an extensive inquiry, the Court determined that the Court of Claims had properly understood state law, and the compensation awards were affirmed.

The next case before this Court involving the Central Valley Project was *Ivanhoe, supra.* That case arose out of proceedings in the state courts, required by federal statute, to confirm contracts for the use of water entered into between state irrigation districts and a state water agency, on the one hand, and the United States on the other. The contracts contained provisions against the use of project water on tracts in excess of 160 acres, a provision specified by § 5 of the Reclamation Act of 1902 and substantially re-enacted in the Omnibus Adjustment Act of 1926, 44 Stat. 650, as amended, 70 Stat. 524, 43 U. S. C. § 423e.[3] They also contained the

---

[3] Section 5 of the Reclamation Act, 32 Stat. 389, provided in pertinent part: "No right to the use of water for land in private ownership shall be sold for a tract exceeding one hundred and sixty acres to any one land-

40-year payout provisions provided for in § 9 of the Reclamation Project Act of 1939, 53 Stat. 1193, as amended, 72 Stat. 542, 43 U. S. C. § 485h. The California Supreme Court refused to confirm the contracts because it construed § 8 of the Reclamation Act of 1902 as requiring the contracts to conform to state law and because the 160-acre limitation and the payout provisions were, for separate reasons, contrary to the law of California. This judgment rested in part on the theory that the water rights acquired by the United States were, by virtue of § 8, subject to the normal trust obligations to water users that were imposed by state law and that were inconsistent with the proposed contract provisions.[4] As described by the Attorney General of California, who represented the state water districts in this Court, the California Supreme Court reasoned that the water rights needed to perform the contracts

---

owner, and no such sale shall be made to any landowner unless he be an actual bona fide resident on such land, or occupant thereof residing in the neighborhood of said land, and no such right shall permanently attach until all payments therefor are made."

[4] The issue posed was revealed by the brief for the United States in *Ivanhoe:*

"The California Supreme Court also erred in upholding the claim of denial of just compensation. Chief Justice Gibson correctly stated in his dissenting opinion below that 'if there is any state-recognized vested right which, in fact, conflicts with the acreage limitation, that right may be taken and compensated for by the federal government under its power of eminent domain' (AJS 73, 79; cf. p. 48). The trust declared and applied by the majority of the court cannot have the effect of imposing a state restriction on the federal power of eminent domain. That power 'is inseparable from sovereignty' because it permits 'acquisition of the means or instruments by which alone governmental functions can be performed.' 'It can neither be enlarged nor diminished by a State. Nor can any State prescribe the manner in which it must be exercised. The consent of a State can never be a condition precedent to its enjoyment.' *Kohl* v. *United States,* 91 U. S. 367, 371–372, 374. It makes no difference whether the property 'sought to be condemned is held . . . in trust instead of in fee.' *United States* v. *Carmack,* 329 U. S. 230, 239. The beneficiaries may press their claims to compensation." Brief for United States as *Amicus Curiae,* O. T. 1957, Nos. 122–125, p. 56.

could not be acquired by the United States; this was an untenable position, the Attorney General contended, because "never before has it been held that property rights in a state could be endowed with attributes which would prevent the United States from acquiring the rights it needs to accomplish a federal purpose." Brief for Appellants in *Ivanhoe Irrigation District* v. *McCracken,* O. T. 1957, Nos. 122–125, p. 21.[5]

This Court unanimously reversed the judgment of the California Supreme Court. It first ruled: "[T]he authority to impose the conditions of the contracts here comes from the power of the Congress to condition the use of federal funds, works, and projects on compliance with reasonable requirements. And . . . if the enforcement of those conditions impairs any compensable property rights, then recourse for just compensation is open in the courts." 357 U. S., at 291. The Court also rejected the argument that § 8 required the Secretary to follow state law that was inconsistent with § 5. As the Court understood § 8, "it merely requires the United States to comply with state law when, in the construction and operation of a reclamation project, it becomes necessary for it to *acquire* water rights or vested interests therein." 357 U. S., at 291. (Emphasis added.) The United States would be obliged to pay for any water rights which were vested under state law and which it took, "[b]ut the *acquisition* of water rights must not be confused with the *operation* of federal projects." *Ibid.* (Emphasis added.) The Court could find nothing in § 8 that "compels the United States to *deliver* water on conditions imposed by the State," 357 U. S., at 292 (emphasis added), and quoted with approval from *Nebraska* v. *Wyoming,* 325 U. S. 589, 615 (1945): " 'We do not suggest that where Congress has provided a system of regulation for federal projects it must give way before an inconsistent state system.' " Accord-

---

[5] The California Attorney General's analysis of the California Supreme Court's opinion is to be found in his Brief for Appellants 54–60.

ingly, the Court held that § 8 did not require the Secretary to ignore § 5, the provisions of which had been national policy for over 50 years.

Like *Gerlach,* the *Dugan* and *Fresno* cases involved the consequences of the Friant Dam on those dependent on the first 60 miles of the San Joaquin downstream from the project. These cases arose from the judgment of the Court of Appeals for the Ninth Circuit entered in a suit brought by water-right claimants below the Friant Dam, including the city of Fresno, for an injunction to prevent the storing and diverting of water at the Dam until a satisfactory remedy for the deprivation of their rights had been achieved. *State v. Rank,* 293 F. 2d 340 (1961). The defendants were local officials of the United States Reclamation Bureau, a number of irrigation and utility districts, and later the United States itself. The District Court overruled the claim that the suit was an unconsented suit against the United States and ordered that the injunction issue unless the Government effected a "physical solution" adequate to satisfy plaintiffs' water rights, which it held the United States was obligated to respect. The Court of Appeals dismissed the United States from the action and then inquired whether the suit against the officials and the districts was also a suit against the United States. This depended in the first instance on whether these officers were acting within their statutory and constitutional authority. If they were not, the suit could go forward. Plaintiffs contended, among other things, that Congress had not conferred any right to condemn water rights along this stretch of the river and that in any event plaintiffs had rights under California's county-of-origin and watershed-of-origin statutes that were not subject to condemnation under state law and hence, pursuant to § 8, were not seizable by the United States.[6]

---

[6] As the Court of Appeals explained, one of the three reasons submitted by the riparian owners for the lack of authority to condemn on the part of the United States was as follows:

"The third contention of the plaintiffs is that California's County of

The Court of Appeals rejected the argument based on § 8 and state law. Section 7 of the original Reclamation Act had authorized the Secretary to acquire any rights necessary to carry out the provisions of the Act and to do so by purchase or by condemnation under judicial process. Moreover, in expressly authorizing the Central Valley Project in 1937, the Rivers and Harbors Act, 50 Stat. 850, provided that the Secretary could "acquire by proceedings in eminent domain, or otherwise, all lands, rights-of-way, water rights, and other property necessary for said purposes . . . ." The Court of Appeals thus found ample authority for the condemnation or taking of the plaintiffs' rights and held that, even if California law gave these plaintiffs a preference over the United States and the other defendants as to rights to appropriate surplus waters, it did not follow that the preferred rights could not be taken by the United States. "While a state can bestow property rights on its citizens which the United States must respect, it cannot take from the United States the power to acquire those rights." 293 F. 2d, at 354. Although holding that the United States had ample power to seize the water rights at issue, the Court of Appeals went on to hold, nevertheless, that no taking in the legal sense had transpired; the officials were mere trespassers, were acting outside their authority, and could be enjoined. Absent condemnation of vested rights, § 8 required the project to respect those rights in operating the project. Hence, an injunction was warranted.

The case was brought to this Court where the public officers continued to claim that they were acting legally and were not subject to suit. Plaintiffs argued, among other things,

---

Origin and Watershed of Origin statutes . . . (which under § 8 of the Reclamation Act . . . the United States is bound to respect), prevent diversion of waters of the San Joaquin beyond its watershed until the rights of these plaintiffs have been satisfied; that to condemn the rights of these plaintiffs for the purpose of such diversion is to disregard California law contrary to § 8." 293 F. 2d, at 354.

that their riparian rights could not be taken by condemnation for purposes of use outside the county of origin or the watershed of origin. Brief for Respondents in *Delano-Earlimart Irrig. Dist.* v. *Rank,* O. T. 1962, No. 115, pp. 30–41. This Court in *Dugan,* however, unanimously agreed with the Court of Appeals that the United States had ample statutory authority to take the asserted rights. "The question was specifically settled in *Ivanhoe Irrigation District* v. *McCracken . . . ,* where we said that such rights could be acquired by the payment of compensation 'either through condemnation or, if already taken, through action of the owners in the courts.'" 372 U. S., at 619. Furthermore, the Court noted: "The power to seize which was granted here had no limitation placed upon it by the Congress, nor did the Court of Appeals bottom its conclusion on a finding of any limitation. [The United States had] plenary power to seize the whole of respondents' rights in carrying out the congressional mandate . . . ." *Id.,* at 622–623.

Disagreeing, however, with the Court of Appeals as to the taking issue, the Court ruled that the power to take had actually been exercised, and properly so, and that the suit against the officers was therefore a suit against the United States and should be dismissed. The remedy of the plaintiffs, as it was in *Gerlach,* was in the Court of Claims.

The Court also granted the petition for certiorari filed by the city of Fresno and dealt separately with the city's case. 372 U. S. 627 (1963). Fresno, as a riparian, overlying landowner, had vested rights to underground waters from a source fed by the San Joaquin River. These rights were threatened by the anticipated diminishment of the San Joaquin below Friant Dam. Among other things, the city claimed that the water necessary to satisfy its rights was being diverted to areas beyond the limits permitted by the county-of-origin and watershed-of-origin statutes of the State of California; under these statutes the city's rights were preferred and were not

subject to condemnation under § 8 and state law.[7]   Opinions
of the Attorney General of California were submitted in sup-
port of this claim.   Brief for Petitioner in *City of Fresno* v.
*California,* O. T. 1962, No. 51, pp. 148–150.[8]   These claims
were essentially those of a riparian owner to the maintenance
of the flow of the San Joaquin River.   Fresno also claimed,
however, that under the county-of-origin and watershed-of-
origin statutes, it had a prior right to Friant Dam water in an
amount necessary to satisfy its needs and that project water
could not be delivered beyond the limits prescribed by these
statutes until the city's needs were met.[9]   Section 8, it was
argued, required the United States to respect the city's rights
under these statutes.   The city also claimed a statutory prior-
ity for municipal uses, as well as the right to purchase project
water for less than the price Bureau officials proposed to
charge.

The Court rejected each of these claims.   The United
States had authority, despite § 8 and state law, to acquire
Fresno's riparian rights, and had done so.   To that extent,
the city's recourse was in the Court of Claims, as in *Dugan.*
Section 8 "does not mean that state law may operate to pre-

---

[7] Question 3 of Fresno's petition for certiorari specifically posed the issue
whether the United States "can take percolating underground waters . . .
by condemnation or eminent domain for agricultural use in areas outside
the county and watershed of origin."   Pet. for Cert., O. T. 1962, No. 51,
p. 6.

[8] The State Attorney General's opinion submitted was in relevant part:
" 'The legislative background of the priority makes it difficult to conceive
that the Legislature intended that the authority could destroy the priority
b[y] condemnation.   Since the priority exists only as against the au-
thority, such a construction would completely destroy the effect of Section
11460 and make its enactment an idle gesture.' "   Brief for Petitioner,
O. T. 1962, No. 51, pp. 148–149.

[9] The dual nature of Fresno's claim, first as a riparian owner with vested
rights to percolating water, and second as a municipality claiming water-
shed preference under state law to project-developed water, is made clear
in 293 F. 2d, at 351–352, 360–361.

vent the United States from exercising the power of eminent domain to acquire the water rights of others. This was settled in *Ivanhoe Irrigation District* v. *McCracken* . . . ." 372 U. S., at 630. Nor did § 8 require "compliance with California statutes relating to preferential rights of counties and watersheds of origin and to the priority of domestic over irrigation uses." 372 U. S., at 629–630. The more limited role of § 8 "is to leave to state law the definition of the property interests, if any, for which compensation must be made." 372 U. S., at 630. The Court went on to say that in any event the California watershed and county statutes did not give Fresno the priority claimed and that the claims with respect to a municipal priority and to a lower water price were contrary to § 9 of the Reclamation Project Act of 1939.[10]

*Fresno* was decided on April 15, 1963, having been argued on January 7 of that year. The opinion and judgment in *Arizona* v. *California,* 373 U. S. 546, were announced on June 3, 1963, the case having been argued for the second time in November 1962. In *Arizona,* the Special Master had concluded that in choosing between users within each State and in settling the terms of his contracts with them, the Secretary was required to follow state law by virtue of §§ 14 and 18 of the Project Act and by reason of § 8 of the Reclamation Act. The Court expressly disagreed, relying on *Ivanhoe* and *Fresno* and saying with respect to § 8:

"The argument that § 8 of the Reclamation Act requires the United States in the delivery of water to follow priorities laid down by state law has already been dis-

---

[10] The usual rule in this Court is that when two independent reasons are given to support a judgment, "the ruling on neither is *obiter,* but each is the judgment of the court and of equal validity with the other." *Union Pacific R. Co.* v. *Mason City & Fort Dodge R. Co.,* 199 U. S. 160, 166 (1905); *United States* v. *Title Ins. Co.,* 265 U. S. 472, 486 (1924). See also *Woods* v. *Interstate Realty Co.,* 337 U. S. 535, 537 (1949); *Massachusetts* v. *United States,* 333 U. S. 611, 623 (1948).

posed of by this Court in *Ivanhoe Irr. Dist.* v. *McCracken,* 357 U. S. 275 (1958), and reaffirmed in *City of Fresno* v. *California,* 372 U. S. 627 (1963). In *Ivanhoe* we held that, even though § 8 of the Reclamation Act preserved state law, that general provision could not override a specific provision of the same Act prohibiting a single landowner from getting water for more than 160 acres. We said:

" 'As we read § 8, it merely requires the United States to comply with state law when, in the construction and operation of a reclamation project, it becomes necessary for it to acquire water rights or vested interests therein. But the acquisition of water rights must not be confused with the operation of federal projects. As the Court said in *Nebraska* v. *Wyoming,* [325 U. S.,] at 615: "We do not suggest that where Congress has provided a system of regulation for federal projects it must give way before an inconsistent state system." . . . We read nothing in § 8 that compels the United States to deliver water on conditions imposed by the State.' [357 U. S.,] at 291–292.

"Since § 8 of the Reclamation Act did not subject the Secretary to state law in disposing of water in that case, we cannot, consistently with *Ivanhoe,* hold that the Secretary must be bound by state law in disposing of water under the Project Act." 373 U. S., at 586–587.

The Court thus held again that § 8 did not require the Secretary to follow state law in distributing project water because § 8 dealt with *acquisition,* not *distribution,* of reclamation water.

## II

The majority reads *Ivanhoe* as holding that § 5 and similar explicit statutory directives are exceptions to § 8's otherwise controlling mandate that state law must govern both the acquisition and distribution of reclamation water. This mis-

interprets that opinion. It is plain enough that in response to the argument that § 8 subjected the § 5 contract provisions to the strictures of state law, the Court squarely rejected the submission on the ground that § 8 dealt only with the acquisition of water rights and required the United States to respect the water rights that were vested under state law. That the Court might have saved the § 5 provision on a different and narrower ground more acceptable to the present Court majority does not render the ground actually employed any less of a holding of the Court or transform it into the discardable dictum the majority considers it to be.

It is also beyond doubt that both *Fresno* and *Arizona* considered *Ivanhoe* to contain a holding that § 8 was limited to water-right acquisition and did not reach the distribution of reclamation water. But whatever the proper characterization of the Court's pronouncement in *Ivanhoe* might be, *Fresno* itself held that in distributing project water the United States, despite state law and § 8, not only was not bound by the municipal-preference laws of California, which were contrary to a specific federal statute, but also could export water from the watershed without regard to the county- and watershed-of-origin statutes. The Court held the latter even though no provision of federal law forbade the federal officers from complying with the preferences assertedly established by those state laws.

Much the same is true of *Arizona,* where the Court heard two arguments totaling over 22 hours and considered voluminous briefs that dealt with a variety of subjects, including the important issue of the impact of § 8 on the Secretary's freedom to contract for the distribution of water. In its opinion, the Court not only dealt with both *Ivanhoe* and *Fresno* as considered holdings that § 8 did not bear on distribution rights, but also expressly disagreed with its Special Master and squarely rejected claims that the Secretary could not contract for the sale of water except in compliance with the priorities

established by state law. Nor, as suggested by the majority, is there anything in the *Arizona* case to suggest that the Court arrived at its conclusion by factors peculiar to the statutes authorizing the project. The particular terms of the Secretary's contracts were not authorized or directed by any federal statute. The Court's holding that he was free to proceed as he did was squarely premised on the proposition that § 8 did not control the distribution of the project water.

The short of the matter is that no case in this Court, until this one, has construed § 8 as the present majority insists that it be construed. All of the relevant cases are to the contrary.

Our cases that the Court now discards are relatively recent decisions dealing with an issue of statutory construction and with a subject matter that is under constant audit by Congress. As the majority suggests, reclamation project authorizations are normally accompanied by declarations that the provisions of the reclamation laws shall be applicable. Here, the New Melones Dam, which was and is a part of the Central Valley Project, was first authorized in 1944, 58 Stat. 901, and again in 1962, 76 Stat. 1191. The latter legislation provided for construction of the Dam by the Army Corps of Engineers but for operation and maintenance by the Secretary of the Interior "pursuant to the Federal reclamation laws . . . ." Those laws included § 8, which by that time had been construed in *Ivanhoe* as set out above. There were no amendments to § 8, which is now codified in 43 U. S. C. §§ 372 and 383, when the project was reauthorized in 1962.

Furthermore, in amending the reclamation laws in 1972, Congress provided that except as otherwise indicated in the amendments, "the provisions of the Federal reclamation laws, and Acts amendatory thereto, are continued in full force and effect." 43 U. S. C. § 421d (1970 ed., Supp. V). More specifically, § 421g stated that nothing in the amendments "shall be construed to repeal or limit the procedural and substantive requirements of sections 372 and 383 of this title."

There is no hint of disagreement with the construction placed on these sections in *Ivanhoe, Dugan, Fresno,* and *Arizona.*

Only the revisionary zeal of the present majority can explain its misreading of our cases and its evident willingness to disregard them. Congress has not disturbed these cases, and until it does, I would respect them. In contrast to *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658 (1978), there is no problem here of reconciling inconsistent lines of cases or of correcting an error with respect to an issue not briefed or argued and raised by the Court *sua sponte. All* of the relevant cases are contrary to today's holding, and in none of them was the Court on a frolic of its own. The courts below were quite right in holding that the State was without power under the reclamation laws to impose conditions on the operation of the New Melones Dam and on the distribution of project water developed by that Dam, which would be undertaken with federal funds.

### III

Even less explicable is the majority's insistence on reaching out to overturn the holding of this Court in *Fresno,* which reflected the decision in *Dugan* and was in turn grounded on a similar approach in *Ivanhoe,* that state law may not restrict the power of the United States to condemn water rights. The issue was squarely presented and decided in both *Dugan* and *Fresno.* In both cases it was claimed—and State Attorney General's opinions supported the claim—that some of the rights at issue were not condemnable under state law and that § 8 therefore forbade their taking by the Federal Government. In both cases, the claim was rejected by this Court, just as it was in the Court of Appeals. Without briefing and argument, the majority now discards these holdings in a footnote. See *ante,* at 671–672, n. 24.

Section 7 of the Reclamation Act, now 43 U. S. C. § 421, authorizes the Secretary to acquire any rights or property

by purchase or condemnation under judicial process, and the Attorney General is directed to institute suit at the request of the Secretary. Also, as Mr. Justice Jackson explained for the Court in *Gerlach,* 339 U. S., at 735 n. 8, when the Central Valley Project was authorized in 1937, the Secretary of the Interior was "authorized to acquire 'by proceedings in eminent domain, or otherwise, all lands, rights-of-way, water rights, and other property necessary for said purposes . . . .' 50 Stat. 844, 850." Furthermore, § 10 of the Reclamation Act, now 43 U. S. C. § 373, authorizes the Secretary to perform any and all acts necessary to carry out the Act. As the Court said in *United States* v. *Buffalo Pitts Co.,* 234 U. S. 228, 233 (1914), "the Government was authorized by § 7 of the act of June 17, 1902, ch. 1093, 32 Stat. 388, under which this improvement was being made to acquire any property necessary for the purpose and if need be to appropriate it." And in *Henkel* v. *United States,* 237 U. S. 43, 50 (1915), the Court, referring to §§ 7 and 10, said:

> "In carrying out the purposes of the act, the Secretary of the Interior is authorized to acquire any rights or property necessary for that purpose, and to acquire the same, either by purchase or by condemnation. He is specifically authorized to perform any and all acts necessary and proper for the purpose of carrying into effect the provisions of the act. Authority could hardly have been conferred in more comprehensive terms, and we do not believe it was the intention of Congress, because of the Indians' right of selection of lands under the circumstances here shown, to reserve such lands from the operation of the act. To do so might defeat the reclamation projects which it was evidently the purpose of Congress to authorize and promote."

Never has there been a suggestion in our cases that Congress, by adopting § 8, intended to permit a State to disentitle the Government to acquire the property necessary or appropriate

to carry out an otherwise constitutionally permissible and statutorily authorized undertaking. *Gerlach, Ivanhoe, Dugan* and *Fresno* are to the contrary.

The Court's "disavowal" of our prior cases and of the Government's power to condemn state water rights, all without briefing and argument, is a gratuitous effort that I do not care to join and from which I dissent.

## IV

Although I do not join the Court in reconstruing the controlling statutes as it does, the Court's work today is a precedent for "setting things right" in the area of statutory water law so as to satisfy the views of a current Court majority. And surely the dicta with which the Court's opinion is laced today deserve no more or no less respect than what it has chosen to label as dicta in past Court decisions. Of course, the matter is purely statutory and Congress could easily put an end to our feuding if it chose to make it clear that local authorities are to control the spending of federal funds for reclamation projects and to control the priorities for the use of water developed by federal projects.