WESTLANDS WATER DISTRICT; San Benito Water District, Plaintiffs,

v.

UNITED STATES of America, DEPARTMENT of INTERIOR, BUREAU of RECLAMATION; Roger K. Patterson, Regional Director Mid–Pacific Region, United States of America, Department of Interior, Bureau of Reclamation, Defendants,

Friant Water Users Authority; the City of Fresno; Madera Irrigation District; City of Orange Cove; Stone Corral Irrigation District; Florencio Ming–Ming; and Ronald Davis;

and

Firebaugh Canal Water District; Central California Irrigation District; San Luis Canal Company; Columbia Canal Company; and Friant Power Authority, Intervenors.

No. CV–F–92–5212 OWW.

United States District Court,
E.D. California.

Nov. 4, 1992.

Thomas William Birmingham, Kronick, Moskovitz, Tiedemann & Girard, Sacramento, Cal., for plaintiffs.

Michael A. Gheleta, U.S. Dept. of Justice, Environment & Natural Res. Div., Sacramento, Cal., Michael Victor Sexton, Minasian, Minasian, Minasian, Spruance, Baber, Meith & Soares, Oroville, Cal., Gregory K. Wilkinson, Best, Best & Krieger, Riverside, Cal., for defendants.

## MEMORANDUM OPINION

WANGER, District Judge.

Plaintiffs Westlands Water District and San Benito County Water District seek injunctive and declaratory relief in this dispute over water allocations made by the Bureau of Reclamation ("Bureau") during the late winter of 1991 and spring of 1992, the sixth consecutive drought year in California. The relief sought cannot be granted under the allegations of the complaint or any variation which plaintiffs could allege, as plaintiffs have neither statutory nor contractual priority to claim higher rights in Central Valley Project water stored in the San Luis Unit over other water contractors.

## I. Background

The Central Valley Project ("CVP") is operated by the Bureau as authorized by various acts of Congress. It consists of a number of facilities which store and distribute water throughout California's Central Valley. Friant Dam, which impounds water from the San Joaquin River in Millerton Lake, was one of the initial CVP facilities constructed. Prior to construction of the dam it was necessary for the Bureau to enter into water rights settlement contracts with downstream riparian water rights holders on the San Joaquin River. Four of these riparian holders are intervenors, Firebaugh Canal Water District, Central California Irrigation District, San Luis Canal Company and Columbia Canal Company (the "Exchange Contractors").

The first of these contracts was signed in 1939 (the "Exchange Contract").[1] Under the Exchange Contract, the Exchange Contractors agreed not to assert their senior water rights by demanding upstream water from the San Joaquin River. For its part, the United States, as holder of an appropriative right, agreed to provide the Exchange Contractors with substitute appropriative water delivered from the Sacramento–San Joaquin Delta via the Delta–Mendota Canal.

The San Luis Unit of the CVP was authorized by the San Luis Act in 1960,[2] for the principal purpose of furnishing water for the irrigation of land in Merced, Fresno and Kings Counties. The San Louis Reservoir is a principal component of the unit. To implement the San Luis Act, the Bureau entered into contracts for the provision of water service to agricultural contractors including Westlands and San Benito. The Westlands Contract was executed in 1963,[3] while the San Benito Contract was execut-

---

1. The parties agree that the controlling version of the contract is No. Ilr–1144, as revised on December 6, 1967.

2. Pub.L. No. 86–488, 74 Stat. 156 (1960).

3. Contract No. 14–06–200–495, signed June 5, 1963.

ed in 1978.[4] The San Luis Reservoir stores Northern California surplus water imported through the Delta for delivery to contractors such as Westlands and San Benito.

On February 14, 1992, in response to the continuing drought which had left water levels in the CVP reservoir near an all-time low, the Bureau's regional director, Roger K. Patterson, a named defendant, issued a declaration finding a shortage for water year 1992 and allocating no water to certain agricultural contractors, including plaintiffs. The regional director revised the declaration on March 8, 1992 and again on March 19, 1992, allocating fifteen, and then twenty-five, percent water supply to agricultural contractors.

Plaintiffs allege, and defendants admit, that the Bureau intended to divert water stored in the San Luis Reservoir in early 1992 to meet its contractual obligations to the Exchange Contractors.[5] Plaintiffs contend that the Bureau, pursuant to the terms of the Exchange Contract, when unable to deliver substitute water as required, must release water not from San Luis Reservoir, but from Millerton Lake.

Plaintiffs' complaint seeks injunctive relief under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* The complaint alleges that (1) the Bureau's intended diversion of water stored in the San Luis Reservoir violates the provisions of the San Luis Act and the Westlands and San Benito Contracts; (2) the Bureau lacks the authority to divert the water stored in the San Luis Reservoir; and (3) the amount of water stored in the San Luis Reservoir at the time of the filing of the complaint was sufficient to supply water to plaintiffs in an amount exceeding fifteen percent,[6] thus making the Bureau's decision to divert this water to the Exchange Contractors, while maintaining fifteen percent allocations to

plaintiffs, arbitrary, capricious and an abuse of discretion. Plaintiffs also seek a judicial declaration of the Bureau's contractual obligations to allocate water stored in the San Luis Reservoir during a shortage.

Two sets of parties have intervened as defendants (collectively, the "Intervenors"). The Exchange Contractors, along with the Friant Power Authority, argue that their contractual rights would be harmed by the issuance of an injunction restricting the Bureau's ability to supply them water from the San Luis Reservoir. Several users of water from Millerton Lake have also intervened,[7] contending that an interpretation of the Exchange Contract requiring the Bureau to supply substitute water from Millerton Lake would harm their ability to use the lake as a water source. Both sets of intervenors have filed answers. The Millerton Lake intervenors filed a motion for judgment on the pleadings in which the Exchange Contractors joined. The United States has filed a motion to dismiss under F.R.C.P. 12(b)(6). The Intervenors have joined in this motion. These motions must be granted for the reasons that follow.

## II. Standards for Summary Judgment and Judgment on the Pleadings

A motion to dismiss for failure to state a claim under F.R.C.P. 12(b)(6) "is viewed with disfavor and is rarely granted." *Hall v. City of Santa Barbara*, 833 F.2d 1270, 1274 (9th Cir.1986), *cert. denied*, 485 U.S. 940, 108 S.Ct. 1120, 99 L.Ed.2d 281 (1988) (*quoting* 5 C. Wright & A. Miller, *Federal Practice & Procedure*, Civil § 1357, at 598 (1969)). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

**4.** Contract No. 8–07–20–W0130, signed April 15, 1978.

**5.** It is not clear from the papers whether the Bureau actually supplied the Exchange Contractors with water from the San Luis Reservoir.

**6.** Plaintiffs' complaint was filed at the time the regional director was adjusting the allocation to agricultural contractors upward to twenty-five

percent. They acknowledge a later allotment of twenty-five percent.

**7.** The intervenors are: Friant Water Users Authority, the City of Fresno, Madera Irrigation District, the City of Orange Cove, Stone Corral Irrigation District, Florencio Ming–Ming and Ronald Davis.

*Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

■■■ In deciding a motion to dismiss, the court "must accept as true all material allegations in the complaint and construe them in the light most favorable to" the plaintiff. *NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986). Yet, the court need not accept as true allegations that contradict facts which may be judicially noticed. *Mullis v. United States Bankruptcy Ct.,* 828 F.2d 1385, 1388 (9th Cir. 1987), *cert. denied,* 486 U.S. 1040, 108 S.Ct. 2031, 100 L.Ed.2d 616 (1988). For example, the court may consider matters of public record including pleadings, orders, and other papers filed with the court or records of administrative bodies. *Mack v. South Bay Beer Distributors, Inc.,* 798 F.2d 1279, 1282 (9th Cir.1986). The court need not accept conclusory allegations, nor unreasonable inferences or unwarranted deductions of fact. *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981), *cert. denied,* 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981). In addition, the court may disregard allegations in the complaint if contradicted by facts established by exhibits attached to the complaint. *Durning v. First Boston Corp.,* 815 F.2d 1265, 1267 (9th Cir.1987).

■■■ A Rule 12(c) motion challenges the legal sufficiency of the opposing party's pleadings. Judgment on the pleadings is appropriate when, even if all material facts in the pleading under attack are true, the moving party is entitled to judgment as a matter of law. *Hal Roach Studios v. Richard Feiner & Co.,* 883 F.2d 1429, 1436 (9th Cir.1989). The court must assume the truthfulness of the material facts alleged in the complaint. All inferences reasonably drawn from these facts must be construed in favor of the responding party. *General Conference Corp. of Seventh–Day Adventists v. Seventh Day Adventist Congregational Church,* 887 F.2d 228, 230 (9th Cir. 1989), *cert. denied,* 493 U.S. 1079, 110 S.Ct. 1134, 107 L.Ed.2d 1039 (1990).

### III. Standards for Relief Under the Administrative Procedure Act and the Declaratory Judgment Act

The standards for judicial review of agency actions under the Administrative Procedure Act (the "APA") were summarized by the Supreme Court in *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415–417, 91 S.Ct. 814, 823–824, 28 L.Ed.2d 136 (1971):

> The court is first required to decide whether the Secretary acted within the scope of his authority. This determination naturally begins with the delineation of the scope of the Secretary's authority and discretion ... Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

(citations omitted).

■■■ To maintain an action for declaratory relief a plaintiff must allege an actual controversy between plaintiff and defendant over which a federal court may exercise jurisdiction. 28 U.S.C. § 2201; *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 735 (Fed.Cir.1988). A party to a written contract may properly seek an interpretation by means of a declaratory judgment. *See Kunkel v. Continental Casualty Company,* 866 F.2d 1269, 1276 (10th Cir.1989). The decision to entertain a justiciable declaratory judgment action remains a matter committed to the sound discretion of the trial court. *Id.* at 1273.

### IV. Discussion

The identity and authenticity of the contracts at issue are not disputed.[8]

8. The parties have stipulated as to the existence   and authenticity of the contracts. The parties

To state a claim under the APA, plaintiffs must establish that the Bureau had no authority to allocate water as it did. Absent such a showing, plaintiffs must establish that the Bureau acted arbitrarily and capriciously in exercising its authority. Four main questions are presented: (1) What authority is given the Bureau under the Reclamation Acts and, in particular, the San Luis Act, to divert water from the San Luis Reservoir to fulfill its contractual obligations to the Exchange Contractors? (2) What authority is given the Bureau under the Exchange Contract to provide substitute water from the San Luis Reservoir? (3) What contractual duties are owed plaintiffs by the Bureau to provide water from the San Luis Reservoir during times of shortage? and (4) If the Bureau has the statutory and contractual authority to take these actions, was its exercise of that authority arbitrary, capricious or an abuse of its discretion?

■ After viewing the complaint in the light most favorable to plaintiffs, the contracts and applicable law establish that the Bureau has the authority to divert water from the San Luis Reservoir to fulfill its contractual obligations to holders of senior water rights within the Central Valley Project. Moreover, the Bureau's decision to divert water stored in San Luis Reservoir to the Exchange Contractors is not arbitrary, capricious or an abuse of discretion in light of the present water shortage in California and the provisions of the Exchange, Westlands, and San Benito Contracts.

*Statutory Authority of the Bureau to Divert Water From the San Luis Reservoir.*

The complaint asserts that the Bureau lacks statutory authority under the San Luis Act to divert water from the San Luis Reservoir to satisfy its contractual obligations to the Exchange Contractors.

*Statutory Rights*

Federal law grants the Bureau broad authority to manage its reclamation program. Section 10 of the 1902 Reclamation Act, 43 U.S.C. § 373, provides:

The Secretary of the Interior is hereby authorized to perform any and all acts and to make such rules and regulations as may be necessary and proper for the purpose of carrying the provisions of this act into full force and effect.

This broad grant of authority gives wide discretion to the Secretary over water management under the 1902 Reclamation Act. Plaintiffs concede that in times of abundance the Bureau is empowered to divert water from the San Luis Reservoir as it sees fit. It is unlikely that Congress intended that water stored in the San Luis Reservoir could only be used to benefit land within the San Luis Unit. Section 6 of the San Luis Act provides for the creation of future water divisions that would also be serviced by water held in the reservoir. San Benito Water District is outside the San Luis Unit. Westlands has also benefitted from a flexible approach to the reservoir's operation. Some 120,000 acres of Westlands' service area lie outside the original San Luis Unit boundaries and are not otherwise provided for in the San Luis Act or other legislation, but have received San Luis Reservoir water for 25 years. This allocation occurred as the result of an opinion letter written by the regional solicitor of the Department of the Interior which concluded that such an action was proper, since:

In enacting the San Luis Act Congress did not abandon an integrated and consolidated operation of the Central Valley Project with the attendant benefit from flexibility of uses.

Special Task Force Report on San Luis Unit, pp. 20–21.

Plaintiffs contend that the Bureau lacks authority to satisfy its obligations to the Exchange Contractors to the *exclusion or detriment of plaintiffs* because the San Luis Unit was created for the primary benefit of land within the unit's service area, as well as those areas, such as San Benito's

have supplied statutes, administrative orders and decisions, maps and other public documents. The court has taken judicial notice of these submissions at the parties' request.

service area, expressly designated by Congress. Plaintiffs claim the San Luis Act forbids the diversion of water from the San Luis Reservoir until its "statutory obligations" to agricultural contractors are met.

Plaintiffs derive their argument from the language of Section 1(a) of the San Luis Act which provides, in part:

> For the principal purpose of furnishing water for the irrigation of approximately five hundred thousand acres of land in Merced, Fresno, and Kings Counties, California, hereinafter referred to as the Federal San Luis unit service area, and as incidents thereto of furnishing water for municipal and domestic use and providing recreation and fish and wildlife benefits, the Secretary of the Interior ... is authorized to construct, operate, and maintain the San Luis unit as an integral part of the Central Valley project.

(emphasis added). Plaintiffs argue that the plain language of the statute demonstrates congressional intent that, in times of shortage, water stored in the San Luis Reservoir be used only for land in the San Luis service area.

Plaintiffs suggest Section 5 of the Act, which grants the Bureau discretion to permit agencies outside the San Luis service area use of the unit's drainage and irrigation facilities, must be interpreted to provide that the Bureau has no inherent power to permit outside agencies' use of the unit's resources and that through its silence, Congress implicitly denied the Bureau the authority to divert water to outsiders.

The San Luis Act contains no express limitation on either the Bureau's authority to manage water contained in the CVP system or to use the storage capacity of its various reservoirs as it sees fit. While plaintiffs correctly note that Congress intended the San Luis expansion to primarily benefit agricultural lands contained in the

unit's service area, there is no express language in Section 1(a) that circumscribes the Bureau's discretion to operate the unit. The legislative declaration that the San Luis unit facility is built with a "principal purpose" does not, without more, prohibit its use for other purposes.

Even if such an inference could be drawn from the words "principal purpose," a statute is not interpreted by focusing on a single word or phrase. "In interpreting a statute, examination of the whole, not isolated words, will disclose legislative intent." *Moorhead v. United States,* 774 F.2d 936, 941 (9th Cir.1985). Plaintiffs fail to attribute any significance to the fact that the cited statement of purpose concludes: "... the Secretary of the Interior ... is authorized to construct, operate, and maintain the San Luis unit as an integral part of the Central Valley project." [9]

Read as a whole, section 1(a) does not assign exclusive water rights to any party, nor does it limit San Luis water use only to San Luis lands. Rather, it is a reaffirmation of Congress's consistent treatment of the CVP as an expanding, coordinated water delivery system. The San Luis Act, along with other reclamation acts, explicitly gives the Bureau the authority to manage the CVP. Section 1(a) explains how the San Luis Unit fits into that system. The section imposes no limit on the Bureau's discretion to make water management decisions in the interests of an integrated water project.

Section 5 does not appear material to resolution of this dispute. It concerns the use of drainage facilities and irrigation facilities for power production purposes. Section 5 makes no mention of limiting the uses of San Luis Reservoir. It does not implicitly or explicitly restrict the Bureau's right to allocate water as part of the overall operation of the CVP.

In opposition papers, plaintiffs argue that the phrase "integral part" refers only to the need to make "the construction and operation of the Unit physically and economically feasible." Plaintiffs offer no authority to support such an interpretation, which belies the entire history

and purpose of a coordinated CVP. For instance, it is because of the Bureau's longstanding operational flexibility that the San Luis Unit receives its water via the Delta–Mendota Canal. The canal was originally built to provide water to the Exchange Contractors, among others.

Plaintiffs also fail to note the import of another portion of Section 1(a) of the San Luis Act which provides:

> In constructing, operating, and maintaining the San Luis unit, the Secretary shall be governed by the Federal reclamation laws (Act of June 17, 1902 (32 Stat. 388), and Acts amendatory thereof or supplementary thereto).

Under Section 8 of the 1902 Reclamation Act, federal reclamation projects must be operated in accordance with state water law, when not inconsistent with congressional directives. *California v. United States*, 438 U.S. 645, 674, 98 S.Ct. 2985, 3000, 57 L.Ed.2d 1018 (1978). Under California water law, an appropriator of water is entitled to its diversion and use subject to prior appropriation by senior holders. Simply put, "the one first in time is the first in right." *Wishon v. Globe Light and Power Co.*, 158 Cal. 137, 140, 110 P. 290 (1910).

Thus, the San Luis Act requires, as does all federal reclamation law, that the Bureau respect California's appropriative water rights hierarchy. Under the terms of the Exchange Contract, the Bureau is not free to stop providing water to the Exchange Contractors. The Exchange Contractors own senior water rights on the San Joaquin River. The Bureau and the Exchange Contractors have contractually agreed to trade water. This arrangement does nothing to alter the fact that under California law, the Exchange Contractors are entitled to available water supplies ahead of junior appropriators. These rights are senior to those involved in the delivery of CVP water to agricultural contractors such as Westlands and San Benito.

### Single Water Course Theory

Plaintiffs maintain that California law is inapplicable here, as appropriative rights apply only to a single water course. That is, since the Exchange Contractors own riparian water rights only on the San Joaquin River, they hold no interest in water stored in the San Luis Reservoir, as it is taken from the Sacramento River system and the Exchange Contractors are entitled only to the release of water held behind the Friant Dam. No authority is cited to support this single water course theory.

Assuming *arguendo*, the viability of a single water course theory, the Exchange Contractors' riparian rights to San Joaquin River water were exchanged in 1939 for a guaranteed allotment of Delta water under a state-issued appropriative permit held by the Bureau. This permit predates the appropriative water permits issued by the state to the federal government in 1961 under which plaintiffs are supplied water. The permit benefiting the Exchange Contractors is older, and senior in right under state law, to the permits used to service the San Luis Unit.

In issuing the 1961 permits, the State of California understood that the Bureau intended to use the San Luis Reservoir to store water for use by entities such as the Exchange Contractors in times of shortage. *See* Decision D–1020, State of California, State Water Rights Board, June 30, 1961. The State Water Resources Control Board decision discusses the amount of storage capacity in the reservoir dedicated to federal use:

> Included in the 830,000 acre-feet is that quantity which may be required for the portion of the Delta–Mendota Canal service area which can be serviced by water from the San Luis Reservoir. Releases of water from the San Luis Reservoir for use within the Delta–Mendota Canal service area appeared to be advantageous in only two years of a 20–year operation study of the reservoir. The study indicated that the average annual release for the Delta–Mendota Canal service area would be 40,000 acre-feet (USBR 56).

*Id.* at 12.

### Legislative History

An extensive search of the legislative history of the San Luis Act reveals neither specific nor implicit reference to a congressional intent that the reservoir be exclusively used for San Luis land-owning water users. Given the controversial nature of the project, and the protracted debate over its passage, such an omission is very signif-

icant.[10] The House Report documents the time that went into consideration of the legislation:

> Legislation to authorize the San Luis project is not new to the committee. During the last several years the committee has spent many days studying the project proposal, and several members of the committee have visited the project service area for an on-the-ground examination.

H.R.Rep. No. 399, 85th Cong., 2d Sess. (1958), *reprinted in* 1960 U.S.C.C.A.N. 2209, 2210. Had Congress intended to preclude the Bureau from using reservoir water to meet other CVP needs, a position which plaintiffs concede is not consistent with other CVP legislation, it could easily have expressed that intention somewhere in the legislative history and by specific language in the statute itself. Congress did neither.

To the contrary, the legislative record indicates that Congress knew of the Bureau's intention to divert water from the reservoir through the Delta–Mendota Canal during drought years. Both the House and Senate Reports contain a letter from the Department of Interior describing the plan for operation of the San Luis Unit:

> The plan proposed would utilize off-season capacity of the existing Tracy pumping plant and Delta–Mendota Canal to deliver surplus Delta water to the proposed San Luis pumping plant forebay. From there the water would be pumped

for storage into the proposed 1 million acre-foot capacity San Luis Reservoir and for later delivery to the lands to be served. (*It may be noted in addition, that our plans call for the release of water from the San Luis Reservoir to meet part of the demands of the Delta–Mendota Canal area in critical dry years when shortages would be shared by all Central Valley project water users.*)

Letters of June 28, 1957 from Assistant Secretary Roger Ernst to the Honorable James E. Murray, Chairman of the Senate Committee on Interior and Insular Affairs, S.Rep. Vol. 4, 85th Cong., 2d Sess. 22–25 (1958) and to the Honorable Claire Engle, Chairman of the House Committee on Interior and Insular Affairs, H.R Rep. Vol. 6, 85th Cong., 2d Sess. 13–16 (1958) (emphasis added).

Plaintiffs suggest that the language in the parenthetical does not refer to the Exchange Contractors. While this may or may not be true, the parenthetical does establish congressional knowledge that Interior planned to use San Luis Reservoir water during times of drought for areas outside the San Luis Unit. Additionally, while the letter envisions the sharing of CVP water, it does not bind the Bureau to make equal allocations to all users.

Furthermore, the legislative history also contains references to San Luis Unit water as "surplus" water.[11] It appears that this

---

**10.** An example of the intense scrutiny paid to the proposed language of the San Luis Act involves the portion of section 1(a) which states:

> In constructing, operating, and maintaining the San Luis Unit, the Secretary shall be governed by the Federal reclamation laws (Act of June 17, 1902 (32 Stat. 388) and Acts amendatory thereof or supplementary thereto.)

The House Report notes that an additional phrase, "except so far as the provisions thereof are inconsistent with this act," was deleted by the House Interior and Insular Affairs Committee after intense debate. The Report states:

> While this phrase obviously related only to provisions set out in the bill and could not be interpreted as exempting the project from other unmentioned provisions of reclamation law, the committee nevertheless removed it in order to allay the fears of those objecting to it and on the basis that the provisions of the bill

will speak for themselves and that such deletion will do no harm.

H.R.Rep. No. 399, 85th Cong., 2d Sess. (1958), *reprinted in* 1960 U.S.C.C.A.N. 2209, 2216.

The Report further explains the heightened sensitivity felt by many, including the Exchange Contractors, that large landholders in the Westlands Water District, specifically Southern Pacific Co., might somehow use language of the Act to circumvent established reclamation law. *Id.* at U.S.C.C.A.N. 2216–20. It is significant that nowhere in the report is a similar fear expressed as to giving certain users such as Westlands exclusive rights to the water in times of shortage.

**11.** *E.g.,* Letter of Roger Ernst, *supra,* H.R.Rep. at 14 ("The plan proposed would utilize off-season capacity of the existing Tracy pumping plant and Delta–Mendota Canal to deliver surplus delta water to the proposed San Luis pump-

entire project to irrigate the western San Joaquin Valley was based on the premise that "surplus" water—that is, water available in excess of then current usage—would be available to supply irrigation needs. Far from implying that Congress intended that San Luis users be given priority, the legislative history indicates that their needs were to be met only after existing needs were satisfied.

### The Exchange Contract

Plaintiffs' complaint alleges that the Bureau's plan to divert water from San Luis Reservoir "is contrary to the Bureau's obligation to satisfy its contractual obligations to the Exchange Contractors through release of water stored in Millerton Lake in the event the Bureau is unable to deliver a substitute supply." Complaint, ¶ 19. Review of the Exchange Contract reveals no requirement that the substitute water come from a particular source.

Article 3 of the contract defines "substitute water" as "all water delivered hereunder at the points of delivery hereinafter specified to the Contracting Entities, *regardless of source*" (emphasis added). Article 5 of the contract does specify the facility through which delivery of the substitute water is to be made, stating that "most if not all of the substitute water provided the Contracting Entities hereunder will be delivered to them via the aforementioned Delta–Mendota Canal." Water is to be delivered from Millerton Lake only if the Bureau is temporarily unable to deliver substitute water via the "Delta–Mendota Canal or other sources." Exchange Contract, art. 4(b).[12] Plaintiffs do not allege that the Bureau is unable or unwilling to continue delivery to the Exchange Contractors via the Delta–Mendota Canal.[13] They fail to allege facts which can be construed to require the release of Millerton Lake water in fulfillment of the Bureau's

contractual obligations with the Exchange Contractors.

### The Westlands and San Benito Contracts

The complaint alleges that the Bureau's action in limiting deliveries to agricultural contractors while diverting water from the San Luis Reservoir violates the terms of the Westlands and San Benito contracts. Coupled with contentions about "violations" of the San Luis Act and the Exchange Contract, this allegation forms the basis for the claim that the Bureau acted without authority, or in the alternative, arbitrarily and capriciously. Scrutiny of the contracts reveals that the Bureau has acted within its contractual obligations.

The Westlands Contract was signed in June, 1963, three years after the San Luis Unit was authorized. It provides for the Bureau's sale of CVP water from the San Luis Unit to Westlands. The contract does not limit the Bureau's right to use water from the unit for other purposes. It does not confer upon Westlands rights to the water superior to any other parties, including the Exchange Contractors.

The Westlands Contract contains a provision which relieves the Bureau of any liability in the event of water shortages. Westlands Contract, art. 11(a). The contract expressly limits Westlands to the "sole remedy" of a price adjustment. *Id.* at art. 11(b). Plaintiffs concede this limitation, yet argue that the APA allows Westlands to seek injunctive relief based on the Bureau's misinterpretation and misapplication of the contractual terms. Even if such relief is available, no facts are alleged which give rise to the inference that the Bureau is acting contrary to the terms of the contract.

Article 11(a) of the Westlands Contract states in part:

ing plant forebay"); S.Rep. Vol. 4, 85th Cong., 2d Sess. 6 (1958) (summary of findings making reference to the intent to integrate the project with the state project's "transfer of surplus water").

12. Article 4(c) provides for the use of water from the lake in cases of permanent disruption in delivery. There is no suggestion that the

Bureau's diversion plans are to be implemented on a permanent basis.

13. The United States has provided maps establishing that delivery of CVP water stored in San Luis Reservoir to the Exchange Contractors is possible via the Delta–Mendota Canal.

In any year in which there may occur a shortage from any cause, the United States reserves the right to apportion the available water supply among the District and others entitled under the then existing contracts to receive water from the San Luis Unit in accordance with conclusive determinations of the Contracting Officer as follows ...

The contract then discusses the concept of shortage in system-wide terms, discussing a CVP-wide allocation system. Plaintiffs have not disputed the existence of a water shortage, nor suggested that a shortage occurs only when the San Luis Reservoir is not filled. They cannot dispute that the plain language of the contract vests conclusive authority to apportion the entire San Luis Unit water supply in the contracting offices of the Bureau.

Apportionment occurs only at the option of the Bureau, *i.e.*, the United States "reserves the right to apportion." The contract does not give Westlands the power to require an apportionment. The remedy section applies to any "shortage or apportionment," which allows for the possibility of a non-apportioned shortage. *Id.* at art. 11(b). Nor does Article 11(a) require, in times of shortage, that *all* water in the San Luis Reservoir be divided among those holding contracts under the San Luis Unit. The United States reserves the right to make "conclusive determinations" as to the "available water supply" to be divided among the San Luis users.

The San Benito Contract was signed in April, 1978, eleven years after the San Felipe Program was authorized. It also lacks any provisions to limit the use of water from the San Luis Reservoir. It contains a bar on the Bureau's liability for damages due to shortage. San Benito Contract, art. 7(a). It defines shortage as a system-wide condition. *Id.* at art. 7(b). Unlike the Westlands Contract, the San Benito Contract mandates apportionment among all users. *Id.* Yet it contains an express exception in cases in which the Contracting Officer is "prohibited by existing contracts, Project authorizations, or he determines that some other method of apportionment is required to prevent undue hardship."

*Id.* The Exchange Contractors hold senior water rights under an "existing contract" within the meaning of the exception which authorizes the regional director not to apportion among all users.

### The Bureau's Exercise of Its Authority

Plaintiffs claim that even if the Bureau had the authority to divert water to their detriment, the 1992 allocation decision made was arbitrary, capricious or an abuse of discretion. To uphold administrative action under the arbitrary and capricious standard, defined by 5 U.S.C. § 706(2)(A), a court need only find a "rational connection between the facts found and the choice made." *Sierra Pacific Indus. v. Lyng*, 866 F.2d 1099, 1105 (9th Cir.1989). Judicial review is narrow, as a court "may not substitute its judgment for that of the agency." *Id.*

The Supreme Court has held that:

the principle of deference to administrative interpretations has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–2783, 81 L.Ed.2d 694 (1984) (citations omitted).

Federal water storage in the joint state-federal San Luis Reservoir on or about Feb. 12, 1992, was 574,300 acre-feet, slightly over half of the 971,000 acre-feet federal share capacity in the reservoir. Bureau Statement of Feb. 14, 1992, *CVP Current Reservoir Storage (as of February 12, 1992)*. The complaint alleges that the Bureau later pumped another 246,700 acre-feet of Delta water into the San Luis Reservoir and it was anticipated it would reach nearly full storage capacity by mid-April. Complaint, ¶ 18. Yet, system-wide, the projections were much more grim. The anticipated deliveries of Central Valley Project water for 1992 were estimated at about

two million acre-feet, down from average annual deliveries of seven million acre-feet. Bureau Statement of Feb. 14, 1992, *Central Valley Project Water Supply for 1992.*

The Bureau announced February 14, 1992, that "[b]ecause facilities of the CVP are operated as an integrated system, the distribution of water in reservoirs may vary widely from reservoir to reservoir throughout the summer to address fishery and other priorities." *Id.* While the Bureau has not revealed its organizational thought processes in the period preceding the allocation announcement, it exercises discretion to deliver water to meet its obligations under the San Luis Act, the contracts, and federal reclamation law generally.

As California's drought entered its sixth year, the Bureau was faced with difficult water allocation decisions. The Bureau had the prerogative to exercise its allocation powers granted under the water shortage provisions in the relevant supply contracts. The Bureau cannot be faulted for honoring its legal commitments to holders of senior water rights, especially when it could do so without breaching its contracts with its agricultural contractors.[14] The suggestion that a fifteen percent (15%) or twenty-five percent (25%) allocation to plaintiffs was unjustified based on actual water availability ignores the Bureau's power to determine and meet water needs on a project-wide basis.

V. Conclusion

Even when read in the light most favorable to plaintiffs, the complaint fails to state a claim upon which the injunctive or declaratory relief sought can be granted. The Bureau has the authority to divert water from the San Luis Reservoir for the use of the Exchange Contractors, even if this diversion occurs to the detriment of plaintiffs. Federal reclamation laws grant the Bureau such authority and the San Luis Act does nothing to diminish it.

The Bureau's action is not arbitrary and capricious. Water allocation is within its statutorily granted authority and special expertise. It has been made the manager of an integrated water storage and delivery project. The Bureau has made allocations in accordance with its contractual obligations. The Bureau's water allocation decisions are entitled to judicial deference, they are neither unlawful or unreasonable.

The claim for declaratory relief must be rejected. There is no set of facts that can be alleged that will permit a judicial determination that the Bureau is required under either the Westlands or San Benito Contracts to provide plaintiffs water from the San Luis Reservoir to the exclusion of other contractors as sought by the complaint.

The motions to dismiss the complaint in its entirety and for judgment on the pleadings are GRANTED without leave to amend.

SO ORDERED.

---

**14.** Arguably, a finding of arbitrariness and capriciousness would have been much more likely had the Bureau adopted the Districts' proposal, *i.e.,* if it had released water from Millerton Lake to the Exchange Contractors. Whatever the percentage of seepage loss caused by transporting Friant water sixty miles along a dry and porous stream bed may be, it is considerably less wasteful to use the concrete-lined Delta–Mendota Canal to meet the Exchange Contractors' needs. Such an act might also constitute a violation of California law which prohibits the unreasonable and wasteful use of water. *See* Cal. Const., art. 14, § 3; Cal.Water Code § 100.